# FROST & FROST TRUCKING CO. *v.* RAILROAD COMMISSION OF CALIFORNIA.

ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

No. 828. Argued April 21, 22, 1926.—Decided June 7, 1926.

1. Assuming that the use of its highways by private carriers for hire is a privilege which the State may deny, it can not constitutionally affix to that privilege the unconstitutional condition precedent that the carrier shall assume against his will the burdens and duties of a common carrier. P. 592.

2. Under the Auto Stage and Truck Transportation Act of California, as amended in 1919, and as construed and applied by the state supreme court in this case, private carriers by automobile for hire can not operate over the state highways between fixed termini without having first secured from the Railroad Commission a certificate of public convenience and necessity, and therein they not merely become subject to regulations appropriate to private carriers but submit themselves to the condition of becoming common carriers and of being regulated as such by the Commission. *Held* violative of the due process clause of the Fourteenth Amendment. P. 591.

70 Cal. Dec. 457, reversed.

ERROR to a judgment of the Supreme Court of California which sustained an order of the Railroad Commission directing the plaintiffs in error to suspend operations under a single private contract for the transportation of fruit over public highways, between fixed termini, unless and until they should secure from the Commission a certificate that public convenience and necessity required the resumption or continuance thereof.

. *Mr. Max Thelen,* with whom *Messrs. H. H. Sanborn, Delancey C. Smith, Frank R. Devlin, Douglas Brookman,* and *Edwin C. Blanchard* were on the brief, for plaintiffs in error.

The Supreme Court of California conceded the well established rule that " the State has no power by mere legislative fiat, or even by constitutional enactment, to transmute a private utility into a public utility, or a private carrier into a public carrier," but the same result is to be accomplished by indirection through a condition to the effect that, if the private operator uses the public highways, it can be only " upon the condition that you in turn shall dedicate the property used by you in such business to the public use of public transportation."

The decision in this case, 70 Cal. Dec. 457, expressly concedes that the Act cannot properly be construed to be a statute regulating the use of the highways. There is no general rule to the effect that the State can prevent the use of its highways by private carriers. *Davis* v. *Mayor of New York,* 14 N. Y. 506; *Macomber* v. *Nichols,* 34 Mich. 212. To protect the public in the use of the highways, there was established, as an exception to the general rule, the proposition that, as to common carriers, the State might prevent the use of the public highways or, if it was willing that they should be used by such common carriers, it might establish such reasonable conditions as might be in the public interest. This exception has never been extended to private carriers using the highways in the pursuit of their private business. One of the fundamental errors in the decision is that it undertakes to treat the exception as though it were, in fact, the general rule. Both the rule and the exception were accurately stated in *Buck* v. *Kuykendall,* 267 U. S. 307. This Court in that case very carefully limited the exception to cases of common carriers.

The effect of this decision, of course, is to hold that in the State of California it is no longer possible for any

private citizen to operate as a private carrier under a private contract over the public highways between fixed termini or over a regular route. See *Michigan Pub. Util. Comm.* v. *Duke,* 266 U. S. 570; *Producers Trans. Co.* v. *Railroad Comm.,* 251 U. S. 228; *Wolf Packing Co.* v. *Industrial Court,* 262 U. S. 522; *Davis* v. *Metcalf,* 131 Wash. 141; *State* v. *Nelson,* 65 Utah 457. See also *Hissem* v. *Guran & Meyers,* 112 Oh. St. 59.

The Act denies the equal protection of the laws in violation of the Fourteenth Amendment. The only possible difference between two trucks may be that one is operated in the private business of the operator in the transportation of his own goods, while the other is operated in the private business of the operator in the transportation of the neighbors' goods for pay. In each case, the highway is being used for the private business of the operator. There is no " natural, inherent or constitutional distinction " or ground of classification betwen these two operations, and if the Frosts are compelled to discontinue the operation of their private business, while at the same time the other truck operator is permitted to continue his private business over the public highways, we have a clear case of a denial of the equal protection of the laws. *Atchison, T. & S. F. R. R.* v. *Matthews,* 174 U. S. 96; *Sou. Ry. Co.* v. *Green,* 216 U. S. 400; *Atchison, T. & S. F. Ry.* v. *Vosburg,* 238 U. S. 56; *Truax* v. *Corrigan,* 257 U. S. 312; *Airway Elec. App. Corp.* v. *Day,* 266 U. S. 71; *Franchise Mot. Frt. Ass'n.* v. *Seavey,* 69 Cal. Dec. 473.

*Mr. Carl I. Wheat* for defendant in error.

There is no question here of arbitrary discrimination against plaintiffs in error, for they have not as yet applied for a certificate to cover operations of the nature proposed by them, and the sole ruling of the Railroad Commission was that they should not so operate unless and until they had secured such a certificate. If, upon

proper application, the Railroad Commission had arbitrarily denied them the certificate in question, a totally different problem would be presented to this Court. Nor are we in this case concerned with any of the other provisions of the statute. Some may and some may not be applicable to such carriers. The sole question here is whether or not a State may require of one who desires to use its public highways as the chief and paramount *situs* of his private haulage business to come to some state agency and obtain a certificate so to do. While the public highways of the State are open and free to all persons for traverse and communication at all times, nevertheless, the State may properly impose reasonable conditions and regulations upon any particular individuals who desire to use such publicly constructed and maintained highways as the chief *situs* of their business of transporting persons or property thereover as a business for hire, whether such use be in the nature of common carriage or otherwise. While this is unquestionably a case of first impression, we believe that the reasoning of the state court is sustainable upon grounds both of law and logic.

Plaintiffs in error present for consideration the following purported dilemma. Say they, in effect: (1) If they apply for a certificate under this statute and, after due notice, hearing, opportunity to present testimony, and formal findings, it is denied, they are deprived of the right (which they claim to be inviolate) of transporting property in their trucks over the public highways for hire under private contracts; whereas, (2) if they apply for a certificate and it is granted, they will be subjected to regulations which, say they, would, in effect, force them into the business of common carriage. Both of these results they urge to be unconstitutional. This second proposition we believe has already been met. There has been no attempt here, either by Legislature or Commission, to make these persons unwillingly assume the status

of common carriers. Most of the cases cited for plaintiffs go off on the point that there has been an attempt to do this; and throughout their brief there appear statements which seem to suggest that this was attempted here. We submit that the most cursory reading of the decision of the state court discloses that nothing could be farther from the fact. The regulation sought to be imposed upon them is not as common carriers, but as carriers for hire by private contract. . Under this statute all private carriers may continue to exist as private carriers.

Plaintiffs have been at great pains to analyze certain provisions of the California Act which they claim can logically be applied only to common carriers. We submit that the applicability of these provisions is not now before this Court for consideration or determination. The portion of this statute here involved, is that which requires every "transportation company" to secure a certificate of public convenience and necessity before operating trucks for hire over the public highways. If there be a logical or inherent distinction in kind the classification is sustainable. There is a difference in kind between the man who, as a mere incident to his business, transports his own property over the highways, and the man who makes of those highways the main instrumentality of his hauling business. No person can be said to have a vested right to make use of the public highways as the *situs* of his business. That is a privilege to which "no one is entitled as of right." See decisions cited in the decision of the court below, particularly *Packard* v. *Banton*, 264 U. S. 140, 144.

In the interest of the public at large, which at enormous expense builds and maintains these highways, it has been found essential to impose regulations upon those who use them. First came the licensing of automobiles and their operators, and the enactment of general safety and weight provisions. These Acts have been broadly

sustained in every State.  But as the use of the automobile developed—as the life of whole communities was transformed by this new mode of locomotion which has made its way into every hamlet—as the network of broad, well-built highways rapidly extended itself from town to town and far out into the farming areas,—there grew up a new and potent form of business,—the transportation of persons and property by automobile.  The first result of this development was that most of the short-line steam and electric railroads of the country went into bankruptcy.  The second was that an insistent demand arose for some regulation.  In California this demand was so strong that the California Supreme Court, upon petition by the short-line railroads of the State, ordered the Commission to assume jurisdiction over automotive carriers under a provision of the state Constitution adopted a quarter of a century before automobiles were invented.  The next year, again at the behest of the short-line railroads, the Legislature passed a comprehensive statute providing for the regulation of " transportation companies " by automobile, including in that term all common carriers of persons or property between fixed termini or over regular routes.  Realizing that its former Act was inadequate in scope, and to bring under reasonable regulation the increasing number of persons who had not held themselves out as common carriers but who nevertheless were using the public highways as the main *situs*,—indeed as the only *situs* of their business of hauling for hire,—the legislature amended the statute which had formerly covered common carriers alone to bring such private carriers under regulation.  And this was done in aid of the commonweal—in order that all who use these public highways as a business for hire between fixed termini or over regular routes might be subjected to a proper public control, not for the purpose of suppressing competition but for the purpose of

upholding the public interest in proper and continuous service, ·and the proper exercise of the special privilege of using the public highways as a place of business.

This whole claim of " private contract " rights is ·illusory.  In the present instance there was but one such contract; but in the *Holmes Case,* 70 Cal. Dec. 752, there were twenty-three, and we suppose that under plaintiff's theory there might well be a thousand.

. Mr. Justice Sutherland delivered the opinion of the Court.

This case involves the constitutional validity of the, Auto Stage and Truck Transportation Act of California, c. 213, Statutes of California, 1917, p. 330, as construed and applied to plaintiffs in error by the state supreme court.  The specific challenge is that, as so construed and applied, it takes their property for public use without just compensation, deprives them of their property without due process of law, and denies them the equal protection of the laws, in violation of the Fourteenth Amendment to the federal Constitution.  The act provides for the supervision and regulation of transportation for. compensation over public highways by automobiles, auto trucks, etc., by the railroad commission.  The term " transportation company " is defined to mean a common carrier for compensation over any public highway between fixed termini or over a regular route.  By § 3, no corporation or person is permitted to operate any automobile, auto truck, etc., " for the transportation of persons or property as a common carrier for compensation on any public highway in this state. between any fixed termini . . .  unless a permit has first been secured as herein provided."  Permits are issued upon application by the incorporated city or town, city and county, or county within or through which the applicant intends to operate.  By § 4, the railroad commission is empowered to supervise

and regulate such transportation companies and to fix their rates, fares, charges, classifications, rules and regulations, and, generally, to regulate them in all matters affecting their relationship with the traveling and shipping public. Section 5 requires, in addition to the permit, that the applicant must obtain from the railroad commission a certificate declaring that public convenience and necessity require the exercise of such right or privilege; and it provides that the commission may attach to the exercise of the rights granted such terms and conditions as in its judgment the public convenience and necessity may require. Operation under a permit without such certificate is prohibited. In 1919, the act was amended, Statutes 1919, c. 280, p. 457, so as to bring under the regulative control of the commission automotive carriers of persons or property operating under private contracts of carriage; and the term " transportation company " was enlarged so as to include such a carrier. It was further provided that no such transportation company shall operate for compensation over the highways without first having secured from the commission a certificate of public convenience and necessity so to do.

Plaintiffs in error were engaged under a single private contract in transporting, for stipulated compensation, citrous fruit over the public highways between fixed termini. They were brought before the commission charged with violating the act, for the reason that they had not secured from the commission a certificate of public convenience and necessity. The commission, while agreeing that plaintiffs in error were, in fact, private carriers, held that they were subject to the provisions of the act and directed them to suspend their operations under their contract unless and until they should secure a certificate that public convenience and necessity required the resumption or continuance thereof. The commission's order was upheld by the State supreme court. 70 Cal. Dec. 457.

On behalf of plaintiffs in error the contention is that, in its application to private carriers, the act has the effect of transforming them into public carriers by legislative fiat. Upon the other side it is said that the sole purpose of the legislation " is to impress upon such private carriers certain regulations so long as they desire to use the publicly built and owned highways as the chief situs of their business of hauling goods for compensation," and that " they are not and cannot be, forced, directly or indirectly, to become common carriers."

It is unnecessary to inquire which view is correct, since the act has been authoritatively construed by the state supreme court. That court, while saying that the state was without power, by mere legislative fiat or even by constitutional enactment, to transmute a private carrier into a public carrier, declared that the state had the power to grant or altogether withhold from its citizens the privilege of using its public highways for the purpose of transacting private business thereon; and that, therefore, the legislature might grant the right on such conditions as it saw fit to impose. In the light of this general statement of principle, it was held that the effect of the transportation act is to offer a special privilege of using the public highways to the private carrier for compensation upon condition that he shall dedicate his property to the quasi-public use of public transportation; that the private carrier is not obliged to submit himself to the condition, but, if he does not, he is not entitled to the privilege of using the highways.

It is very clear that the act, as thus applied, is in no real sense a regulation of the use of the public highways. It is a regulation of the business of those who are engaged in using them. Its primary purpose evidently is to protect the business of those who are common carriers in fact by controlling competitive conditions. Protection or conservation of the highways is not involved. This, in effect,

is the view of the court below plainly expressed. 70 Cal. Dec. pp. 464–465, 466.

Thus, it will be seen that, under the act as construed by the state court, whose construction is binding upon us, a private carrier may avail himself of the use of the highways only upon condition that he dedicate his property to the business of public transportation and subject himself to all the duties and burdens imposed by the act upon common carriers. In other words, the case presented is not that of a private carrier who, in order to have the privilege of using the highways, is required merely to secure a certificate of public convenience and become subject to regulations appropriate to that kind of a carrier; but it is that of a private carrier who, in order to enjoy the use of the highways, must submit to the condition of becoming a common carrier and of being regulated as such by the railroad commission. The certificate of public convenience, required by § 5, is exacted of a common carrier and is purely incidental to that status. The requirement does not apply to a private carrier *qua* private carrier, but to him only in his imposed statutory character of common carrier. Apart from that signification, so far as he is concerned, it does not exist.

That, consistently with the due process clause of the Fourteenth Amendment, a private carrier cannot be converted against his will into a common carrier by mere legislative command, is a rule not open to doubt and is not brought into question here. It was expressly so decided in *Michigan Commission* v. *Duke*, 266 U. S. 570, 577–578. See also, *Hissem* v. *Guran*, 112 O. S. 59; *State* v. *Nelson*, 65 Utah 457, 462. The naked question which we have to determine, therefore, is whether the state may bring about the same result by imposing the unconstitutional requirement as a condition precedent to the enjoyment of a privilege, which, without so deciding, we shall assume to be within the power of the state altogether to

withhold if it sees fit to do so.    Upon the answer to this question, the constitutionality of the statute now under review will depend.

There is involved in the inquiry not a single power, but two distinct powers.    One of these—the power to prohibit the use of the public highways in proper cases—the state possesses; and the other—the power to compel a private carrier to assume against his will the duties and burdens of a common carrier—the state does not possess.    It is clear that any attempt to exert the latter, separately and substantively, must fall before the paramount authority of the Constitution.    May it stand in the conditional form in which it is here made?    If so, constitutional guaranties, so carefully safeguarded against direct assault, are open to destruction by the indirect but no less effective process of requiring a surrender, which, though, in form voluntary, in fact lacks none of the elements of compulsion.    Having regard to form alone, the act here is an offer to the private carrier of a privilege, which the state may grant or deny, upon a condition, which the carrier is free to accept or reject.    In reality, the carrier is given no choice, except a choice between the rock and the whirlpool,—an option to forego a privilege which may be vital to his livelihood or submit to a requirement which may constitute an intolerable burden.

It would be a palpable incongruity to strike down an act of state legislation which, by words of express divestment, seeks to strip the citizen of rights guaranteed by the federal Constitution, but to uphold an act by which the same result is accomplished under the guise of a surrender of a right in exchange for a valuable privilege which the state threatens otherwise to withhold.    It is not necessary to challenge the proposition that, as a general rule, the state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose.    But the power of the state in that respect is not

unlimited; and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence.

The prior decisions of this court amply justify this conclusion. In *Paul* v. *Virginia,* 8 Wall. 168, 181, the rule was stated to be that the state, having the power to exclude foreign corporations from its limits, may admit them upon such terms and conditions as the state may think proper to impose. But in *Insurance Company* v. *Morse,* 20 Wall. 445, 456, it was said that this sweeping language must be understood with reference to the facts of that case; and that it could not be extended to include conditions repugnant to the Constitution and laws of the United States. In *Barron* v. *Burnside,* 121 U. S. 186, 197, this limitation was expressly reaffirmed. Mr. Justice Blatchford, speaking for the court, said (p. 200):

"The question as to the right of a state to impose upon a corporation engaged in interstate commerce the duty of obtaining a permit from the state, as a condition of its right to carry on such commerce, is a question which it is not necessary to decide in this case. In all the cases in which this court has considered the subject of the granting by a state to a foreign corporation of its consent to the transaction of business in the state, it has uniformly asserted that no conditions can be imposed by the state which are repugnant to the Constitution and laws of the United States. *La Fayette Ins. Co.* v. *French,* 18 How. 404, 407; *Ducat* v. *Chicago,* 10 Wall. 410, 415; *Ins. Co.* v. *Morse,* 20 Wall. 445, 456; *St. Clair* v. *Cox,* 106 U. S. 350, 356; *Phila. Fire Assn.* v. *New York,* 119 U. S. 110, 120."

In *Southern Pacific Company* v. *Denton,* 146 U. S. 202, 207, there was under consideration a Texas statute re-

quiring a foreign corporation desiring to do business in the state, to agree that it would not remove any suit from a court of the state into the circuit court of the United States. This court held the statute invalid, saying:

" But that statute, requiring the corporation, as a condition precedent to obtaining a permit to do business within the State, to surrender a right and privilege secured to it by the Constitution and laws of the United States, was unconstitutional and void, and could give no validity or effect to any agreement or action of the corporation in obedience to its provisions."

After the *Denton Case,* came *Security Mutual Life Ins. Co.* v. *Prewitt,* 202 U. S. 246. That decision purported to follow the case of *Doyle* v. *Continental Ins. Co.,* 94 U. S. 535, and to differentiate *Barron* v. *Burnside, supra;* and it was thought to have materially modified the rule laid down in the *Morse, Burnside* and *Denton* cases. But however this may be, both the *Prewitt* and *Doyle* cases have been quite recently overruled, and the views of the minority therein expressed declared to be now the law of this court. · *Terral* v. *Burke Constr. Co.,* 257 U. S. 529, 533. In the light of this declaration, these dissenting views become pertinent and controlling. In the *Doyle Case,* Mr. Justice Bradley, speaking for the minority, said (pp. 543, 544):

" Though a State may have the power, if it sees fit to subject its citizens to the inconvenience, of prohibiting all foreign corporations from transacting business within its jurisdiction, it has no power to impose unconstitutional conditions upon their doing so. Total prohibition may produce suffering, and may manifest a spirit of unfriendliness towards sister States; but prohibition, except upon conditions derogatory to the jurisdiction and sovereignty of the United States, is mischievous, and productive of hostility and disloyalty to the general government. If a

State is unwise enough to legislate the one, it has no con-
stitutional power to legislate the other.   .   .   .

  " The whole thing, however free from intentional dis-
loyalty, is derogatory to that mutual comity and respect
which ought to prevail between the State and general
governments, and ought to meet the condemnation of the
courts whenever brought within their proper cognizance."

  In the *Prewitt Case*, Mr. Justice Day, dissenting, said
(pp. 267–269):

  " In the opinion of the court in this case the doctrine
that a corporation cannot be permitted to be deprived of
its right to do business because of the assertion of a Fed-
eral right is said not to be denied, because the right of a
foreign corporation to do business in a State is not secured
or guaranteed by the Federal Constitution. Conceding
the soundness of this general proposition, it by no means
follows that a foreign corporation may be excluded solely
because it exercises a right secured by the Federal Con-
stitution. For, conceding the right of a State to exclude
foreign corporations, we must not overlook the limitation
upon that right, now equally well settled in the jurispru-
dence of this court, that the right to do business cannot be
made to depend upon the surrender of a right created and
guaranteed by the Federal Constitution. If this were
otherwise, the State would be permitted to destroy a right
created and protected by the Federal Constitution under
the guise of exercising a privilege belonging to the State,
and, as we have pointed out, the State might thus deprive
every foreign corporation of the right to do business
within its borders, except upon the condition that it
strip itself of the protection given it by the Federal
Constitution.   .   .   .

  ".   .   .   While we concede the right of a State to ex-
clude foreign corporations from doing business within its
borders for reasons not destructive of Federal rights, we
deny that the right can be made to depend upon the sur-

render of the protection of the Federal Constitution, which secures to alien citizens the right to resort to the courts of the United States.

" In the cases decided in this court subsequently to *Barron* v. *Burnside,* while the general proposition is affirmed that a State may prescribe conditions upon which a foreign corporation may do business within its borders, in no one of them is it asserted that the State may exclude or expel such corporations because they insist upon the exercise of a right created by the Federal Constitution. On the contrary, this court has repeatedly said that such right of exclusion was qualified by the superior right of all citizens to enjoy the protection of the Federal Constitution."

In *Western Union Tel. Co.* v. *Kansas,* 216 U. S. 1, 34–48, upon a full review of the prior decisions, the principle set forth in the foregoing quotations was again reaffirmed. That case involved the validity of a Kansas statute which provided that a corporation of another state, though engaged in interstate business, must, as a condition of doing local business, pay to the state certain graduated percentages of its capital stock. It was held that this requirement operated as a burden on the interstate business of the company, in violation of the commerce clause of the Constitution, as well as a tax on its property beyond the limits of the state, in violation of the due process of law clause; that, thus, it was violative of the constitutional rights of the company; and that the right of the company to continue to do business in Kansas was not and could not be affected by the condition. The general principle was again announced in the following words (pp. 47–48):

" The right of the Telegraph Company to continue the transaction of local business in Kansas could not be made to depend upon its submission to a condition prescribed by that State, which was hostile both to the letter and spirit

of the Constitution. The company was not bound, under any circumstances, to surrender its constitutional exemption from state taxation, direct or indirect, in respect of its interstate business and its property outside of the State, any more than it would have been bound to surrender any other right secured by the National Constitution."

Since that decision, the same principle has been reiterated many times and never departed from. *Pullman Co. v. Kansas*, 216 U. S. 56, 63; *International Textbook Co. v. Pigg*, 217 U. S. 91; *Herndon v. Chi., Rock Island & Pac. Ry.*, 218 U. S. 135, 158; *Harrison v. St. L. & San Francisco R. R.*, 232 U. S. 318, 332; *Looney v. Crane Co.*, 245 U. S. 178, 187; *International Paper Co. v. Massachusetts*, 246 U. S. 135, 142–143; *Western Union Tel. Co. v. Foster*, 247 U. S. 105, 114; *Public Utility Commrs. v. Ynchausti & Co.*, 251 U. S. 401, 404; *Terrall v. Burke Constr. Co., supra; Burnes Natl. Bank v. Duncan*, 265 U. S. 17, 24; *Fidelity and Deposit Co. of Maryland v. Tafoya et al.*, 270 U. S. 426.

And the principle, that a state is without power to impose an unconstitutional requirement as a condition for granting a privilege, is broader than the applications thus far made of it. In *Western Union Tel. Co. v. Foster, supra,* two telegraph companies were engaged in transmitting the quotations of the New York Stock Exchange among the states. This was held to be interstate commerce, and an order of the Public Service Commission of Massachusetts, requiring the companies to remove a discrimination, was held to infringe their constitutional rights. One of the grounds upon which the order was defended was that it rested upon the power of the state over the streets which it was necessary for the telegraph to cross. That contention was answered broadly (p. 114):

" But if we assume that the plaintiffs in error under their present charters could be excluded from the streets,

the consequence would not follow. Acts generally lawful may become unlawful when done to accomplish an unlawful end, *United States* v. *Reading Co.,* 226 U. S. 324, 357, and a constitutional power cannot be used by way of condition to attain an unconstitutional result. _ *Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1. *Pullman Co.* v. *Kansas,* 216 U. S. 56. *Sioux Remedy Co.* v. *Cope,* 235 U. S. 197, 203. The regulation in question is quite as great an interference as a tax of the kind that repeated decisions have held void. It cannot be justified ' under that somewhat ambiguous term of police powers.' ".

And, in almost the last expression of this court upon the subject, *Burnes Natl. Bank* v. *Duncan, supra,* the rule is none the less broadly but more succinctly stated to be (p. 24):

" The States cannot use their most characteristic powers to reach unconstitutional results. *Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1. *Pullman Co.* v. *Kansas,* 216 U. S. 56. *Western Union Telegraph Co.* v. *Foster,* 247 U. S. 105, 114."

We hold that the act under review, as applied by the court below, violates the rights of plaintiffs in error as guaranteed by the due process clause of the Fourteenth Amendment; and that the privilege of using the public highways of California in the performance of their contract is not and cannot be affected by the unconstitutional condition imposed. *Western Union Tel. Co.* v. *Kansas.* supra, p. 48.

The court below seemed to think that, if the state may not subject the plaintiffs in error to the provisions of the act in respect of common carriers, it will be within the power of any carrier, by the simple device of making private contracts to an unlimited number, to secure all the privileges afforded common carriers without assuming any of their duties or obligations. It is enough to say that no such case is presented here; and we are not to be

understood as challenging the power of the state, or of the railroad commission under the present statute, when-· ever it shall appear that a carrier, posing as a private carrier, is in substance and reality a common carrier, to so declare and regulate his or its operations accordingly.

*Judgment reversed.*

---

MR. JUSTICE HOLMES, dissenting.

The question is whether a State may require all corporations or persons, with immaterial exceptions, who operate automobiles,·&c., for the transportation of persons or property over a regular route and between fixed termini on the public highways of the State, for compensation, to obtain a certificate from the railroad commission that public necessity and convenience require such operation. A fee has to be paid for this certificate and transportation companies are·made subject to the power of the railroad commission to regulate their rates, accounts and service. The provisions on this last point are immaterial here, as the case arises upon an order of the commission under § 5 · that the plaintiffs in error desist from transportation of property as above unless and until they obtain the certificate required, and by the terms of the statute every section and clause in it is independent of the validity of all the rest. § 10. Whatever the Supreme Court of California may have intimated, the only point that it decided, because that was the only question before it, was that the order of the commission should stand.

This portion of the act is to be considered with reference to the reasons that may have induced the legislature to pass it, for if a warrant can be found in such reasons they must be presumed to have been the ground. I agree, of course, with the cases cited by my brother Sutherland, to which may be added *American Bank & Trust Co.* v. *Federal Reserve Bank,* 256 U. S. 350, 358, that even generally

lawful acts or conditions may become unlawful when done or imposed to accomplish an unlawful end. But that is only the converse of the proposition that acts in other circumstances unlawful may be justified by the purpose for which they are done. This applies to acts of the legislature as well as to the doings of private parties. The only valuable significance of the much abused phrase police power is this power of the State to limit what otherwise would be rights having a pecuniary value, when a predominant public interest requires the restraint. The power of the State is limited in its turn by the constitutional guaranties of private rights, and it often is a delicate matter to decide which interest preponderates and how far the State may go without making compensation. The line cannot be drawn by generalities, but successive points in it must be fixed by weighing the particular facts. Extreme cases on the one side and on the other are *Edgar A. Levy Leasing Co.* v. *Siegel,* 258 U. S. 242, and *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393.

The point before us seems to me well within the legislative power. We all know what serious problems the automobile has introduced. The difficulties of keeping the streets reasonably clear for travel and for traffic are very great. If a State speaking through its legislature should think that, in order to make its highways most useful, the business traffic upon them must be controlled, I suppose that no one would doubt that it constitutionally could, as, I presume, most States or cities do, exercise some such control. The only question is how far it can go. I see nothing to prevent its going to the point of requiring a license and bringing the whole business under the control of a railroad commission so far as to determine the number, character and conduct of transportation companies and so to prevent the streets from being made useless and dangerous by the number and lawlessness of those who seek to use them. I see nothing in this act that would

require private carriers to become common carriers, but if there were such a requirement, it, like the provisions concerning rates and accounts, would not be before us now, since, as I have said, the statute makes every section independent and declares that if valid it shall stand even if all the others fall. As to what is before us, I see no great difference between requiring a certificate and requiring a bond as in *Packard* v. *Banton,* 264 U. S. 140, and although, as I have said, I do not get much help from general propositions in a case of this sort, I cannot forbear quoting what seems to me applicable here. Distinguishing between activities that may be engaged in as a matter of right and those like the use of the streets that are carried on by government permission, it is said: " In the latter case the power to exclude altogether generally includes the lesser power to condition and may justify a degree of regulation not admissible in the former." 264 U. S. 145. I think that the judgment should be affirmed.

MR. JUSTICE BRANDEIS concurs in this opinion.

---

The separate opinion of MR. JUSTICE McREYNOLDS.

Our primary concern is with the decree below—not with the reasons there advanced to support it. I suppose, if that court had simply approved the action of the Railroad Commission and had said nothing more, there would be little, if any, difficulty here in finding adequate ground for affirmance.

The questions involved relate solely to matters of intrastate commerce. No complication arises by reason of the power of Congress to regulate interstate commerce. Having built and paid for the roads, California certainly has the general power of control. Plaintiffs in error are without constitutional right to appropriate highways to their own private business as carriers for hire. And if, in so

many words, the Legislature had said that no intrastate carriers for hire except public ones shall be permitted to operate over the state roads it would have violated no federal law. So far as the rights of plaintiffs in error are · affected, nothing more, serious than that has been done.

The States are now struggling with new and enormously difficult problems incident to the growth of auto-motive traffic, and we should carefully refrain from interference unless and until there is some real, direct and material infraction of rights guaranteed by the federal Constitution.

I think the decree of the court below should be affirmed. ·