## UNITED STATES v. McMURTRY.

District Court, S. D. New York.

Aug. 25, 1930.

Charles H. Tuttle, U. S. Atty., of New York City (Frank W. Ford, Asst. U. S. Atty., of New York City, of counsel), for the United States.

John J. Cunneen, of New York City, for defendant.

AUGUSTUS N. HAND, Circuit Judge.

Congress in 1916 created a Council of National Defense, the purpose of which was the "co-ordination of industries and resources for the national security and welfare."  Section 2 (50 USCA § 1).  Its duties among other things were "to supervise and direct investigations and make recommendations to the President and the heads of executive departments as to * * * data as to amounts, location, method and means of production, and availability of military supplies; the giving of information to producers and manufacturers as to the class of supplies needed by the military and other services of the Government, the requirements relating thereto, and the creation of relations which will render possible in time of need the immediate concentration and utilization of the resources of the Nation."  Section 2 (50 USCA § 3).  It was empowered to adopt rules and regulations for its work and to organize subordinate bodies for its assistance in special investigations either by the employment of experts or the creation of committees.  Section 2 (50 USCA § 4).

On March 4, 1918, the President undertook to reorganize a subordinate board of the Council of National Defense known as the War Industries Board by making it an ad-

---

ministration body responsible only to himself. He had been authorized under section 120 of the Act of June 3, 1916 (50 USCA § 80), to place an order for needed material with any person, which was to be given preference over all private engagements, and under the Overman Act of May 20, 1918 (40 Stat. 556), he was authorized "to make such redistribution of functions among executive agencies as he may deem necessary." Section 1.

The War Industries Board set up an Administrative Committee called the Wool Division which met representatives of the wool dealers and growers and promulgated regulations fixing the prices of the 1918 wool clip on the basis of those approved by the government as the Atlantic seaboard prices on July 30, 1917. The regulations provided that the government should have a prior right to acquire all of the 1918 wool clip or any portion thereof at the prices fixed by the War Industries Board, the remainder to be subject to allocation for civilian purposes under the direction of that Board. According to the terms of the regulations, the growers were to receive fair prices for their wool based on the Atlantic seaboard prices as established on July 30, 1917, less freight to seaboard, moisture, shrinkage, and interest, and less a gross profit to the dealer which should in no cases exceed 1½ cents per pound on the total season's business, such profit to cover all expenses from grower to loading wool on board cars. On consignments forwarded to distributing centers the prices to be paid for the wool to approved dealers were to be the Atlantic seaboard values of July 30, 1917, plus a commission of 4 per cent. to be paid by the government, if bought by the government, or by the manufacturer to whom the wool is allocated for other than government purposes—this commission to include grading and other expenses of handling.

The regulations provided that all the wool of the 1918 clip must be distributed through approved dealers in approved centers of distribution, and defined approved dealers as those dealers authorized by the War Industries Board to handle wool who are located in the distributing centers. The regulations also contained the following clause upon which the claims of the government in this action are based: "As a guard against profiteering, the books of all approved dealers in distributing centers shall be at all times open to government inspection, and if it be found that their gross profits, including the aforesaid commission of 4 per cent, are in excess of 5 per cent on the season's business then those gross profits shall be disposed of as the government decides."

These regulations have been held invalid by the Court of Appeals of the Fourth Circuit in United States v. McFarland, 15 F. (2d) 823, 833, and by the Court of Appeals of the First Circuit in United States v. Smith, 39 F. (2d) 851, on the ground that there was no authority either in the act creating the Council of National Defense, or in the Overman or Lever Acts authorizing the fixing of prices for the sale of wool, and it has been substantially conceded by the government that the validity of the regulations cannot be sustained, so far as they purported to fix prices.

But the Wool Division obtained from approved dealers to whom it issued permits agreements to conduct their business in accordance with the regulations, and the government insists that any dealer who signed such an agreement and sold wool to the government became bound to perform his contract in accordance with the regulations, entirely irrespective of whether they were issued under proper authority or not.

The defendant in the case at bar applied for a license as an approved dealer and executed an agreement in the following form:

"May 27, 1918.

"I, the undersigned, having received from the Wool Division of the War Industries Board a permit to operate as an approved wool dealer in a distributing center, hereby agree to operate subject to the rules heretofore adopted or to be adopted by said Board for the handling of the 1918 domestic clip.

"My permit is subject to immediate revocation for failure to comply with said regulations.

"John E. McMurtry & Co.
"New York, N. Y."

The government contends that the foregoing instrument when followed by the receipt of wool from McMurtry and the payment to him of a 4 per cent. commission gave rise to an obligation on his part to repay to the United States any excess of his gross profits (including his commission of 4 per cent.) which exceeded 5 per cent. of the season's business. Indeed Judge Rose, writing for the Circuit Court of Appeals of the Fourth Circuit, in United States v. McFarland, supra, though dismissing the claim against McFarland because (among other reasons) McFarland had entered into no specific agreement to operate subject to the regulations of the Wool Division, distinguished McFarland's relation from that of one who had executed an agreement so to

operate. He said: "The government * * * insists that it is entitled to recover because the defendants for a valuable consideration promised to make the payment demanded of them. If such a promise was made, and its enforcement is not forbidden by some rule of public policy, it may well be held binding, whether it was or was not one which those acting for the government had a right to require. * * * If there was an express contract, it would scarcely be necessary to inquire into the extent of the powers of either the Wool Section or the War Industries Board. Who suggests the form a government contract takes is usually immaterial."

The foregoing apparently amounts to a dictum to the effect that sales made under a license accompanied by an agreement by an approved dealer in the form which McMurtry executed impose a binding obligation upon the dealer to fulfill his promise as far as performance is not forbidden or excused by some rule of public policy. Agreements in the form executed here have been treated as creating valid obligations on the part of the dealer to repay excess profits according to the regulations both by the Circuit Court of Appeals of the Seventh Circuit in United States v. Kraus, 33 F.(2d) 406, and by numerous decisions of the District Courts.

█ But the defendant says that the agreement here was executed under duress, and that the provision for repayment of excess profits is, therefore, unenforceable and invalid. The Supreme Court, has, however, frequently held that such means as the Wool Division employed to prevent profiteering and to expedite the delivery of materials which the government wished to secure does not amount to duress, and that, where duress does not exist, a person contracting with the government must ordinarily perform his contract irrespective of whether the government would have had the right to require performance from one who had not contracted voluntarily. Frost Trucking Co. v. R. R. Com., 271 U. S. 583, 46 S. Ct. 605, 70 L. Ed. 1101, 47 A. L. R. 457; American Smelting Co. v. United States, 259 U. S. 75, 42 S. Ct. 420, 66 L. Ed. 833; Morrisdale Coal Co. v. United States, 259 U. S. 188, 42 S. Ct. 481, 66 L. Ed. 892; Silliman v. United States, 101 U. S. 465, 25 L. Ed. 987.

█ None of these decisions, however, seems to require performance of a regulation to repay excess profits such as is found here. The government bought wool on its own terms and neither makes any complaint of the price

it has paid nor does it, by reason of the regulations, or otherwise, seek to recover anything for its own benefit. It could not keep any excess profits collected without a breach of faith, for it has declared another purpose in its regulations, however indefinite that purpose may have been, nor, as the opinion in United States v. McFarland, supra, points out, can it distribute any such profits in an equitable way. The plan was to keep down prices by requiring the dealers to part with any profits in excess of 5 per cent. of the season's business. The exaction of a repayment of excess profits was not by way of damages, for no one had suffered any damages in a legal sense, but was in order to prevent profiteering at the expense of the woolgrowers by penalizing the dealers. The persons to whom any excess profits were to be paid were wholly unascertained at the time the regulations were promulgated; indeed they were not mentioned in the regulations even as a class. The requirement of the regulation that the excess profits should be repaid not as damages to the United States, and not even for its benefit, but for such disposition as "the government decides" involves the imposition of a penalty. No authority was given to the War Industries Board to impose penalties, nor could Congress delegate to it such a matter. United States v. Grimaud, 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563; United States v. Eaton, 144 U. S. 677, 12 S. Ct. 764, 36 L. Ed. 591.

The case is quite different from Dayton-Goose Creek Ry. v. United States, 263 U. S. 456, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472. There excess income earned by the railroads while under government control, being a fund to which no railroad had any legal or equitable right, was held properly distributable among the weaker railroads in order to help them to discharge their public duties more effectively. Here the excess profits neither belonged to the United States nor was distributable among members of any named class. The attempt to recover them under an unauthorized regulation is the mere enforcement of a penalty and not the requirement that the defendant perform a contract for the benefit of the United States or of any ascertainable person.

In United States v. Smith, 39 F.(2d) 851, where the facts were like the present, the Circuit Court of Appeals of the First Circuit held that the acceptance of the license by the defendant only bound him to meet valid requirements of the regulation, and that the repayment of excess profits was not such a requirement. In United States v. McFar-

land, 15 F.(2d) at page 836, et seq., the Court of Appeals of the Fourth Circuit definitely held that a requirement that excess profits should be repaid was invalid because such an exaction would involve the enforcement of a penalty and not the performance of a contractual obligation. The acceptance of a license upon condition that the licensee conform to certain regulations was held in United States v. Smith supra, only to bind the licensee to conform to such as were valid. See, also, Power Mfg. Co. v. Saunders, 274 U. S. 490, 47 S. Ct. 678, 71 L. Ed. 1165; Hanover Insurance Co. v. Harding, 272 U. S. at page 507, 47 S. Ct. 179, 71 L. Ed. 372, 49 A. L. R. 713; Frost Trucking Co. v. R. R. Co., 271 U. S. at page 594, 46 S. Ct. 605, 70 L. Ed. 1101, 47 A. L. R. 457; W. W. Cargill Co. v. Minnesota, 180 U. S. at page 468, 21 S. Ct. 423, 45 L. Ed. 619. If the license and regulations be taken on their own merits without considering the written agreement to operate in accordance with their provisions, the clause for the disposition of excess profits would clearly be void because such a regulation was made without authority. As a contractual provision it is invalid because requiring the payment of a penalty.

At the trial I took a special verdict because I was then under the impression that the regulation for repayment of excess profits was valid for the reason that the defendant had contracted to conduct his business subject to the regulations. But the elaborate opinion of the Circuit Court of Appeals of the Fourth Circuit in United States v. McFarland, and of the Circuit Court of Appeals of the First Circuit in United States v. Smith, which followed the McFarland decision, have caused me to modify my former view. If the provision relating to the repayment of excess profits had been for the purpose of a readjustment of the prices paid to the dealers by the United States and for its benefit, a different question would have been presented from the one here. But an agreement to pay profits to unascertained and undesignated third persons is in quite a different category.

For the foregoing reasons the motion of the defendant for the direction of a verdict in his favor is granted and a general verdict is hereby directed for the defendant upon both causes of action, and the motion of the plaintiff for the direction of a general verdict in its favor is denied.

Judgment for the defendant shall be entered accordingly.