# Constitutionality of Proposed Statutory Provision Requiring Prior Congressional Notification for Certain CIA Covert Actions

A proposed statutory provision that would oblige the President to notify Congress of any and all covert actions (other than those for the purpose of intelligence-gathering) to be funded out of the Reserve for Contingencies, regardless of the circumstances, would unconstitutionally infringe upon the President's constitutional responsibilities, including his duty to safeguard the lives and interests of Americans abroad.

July 31, 1989

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This is in response to your request for our opinion on the constitutionality of a proposed amendment to section 502 of the National Security Act, 50 U.S.C. § 414. That amendment would prohibit the expenditure or obligation of any funds from the "Reserve for Contingencies" for any covert action in a foreign country (other than for the purpose of intelligence-gathering) if the President has not first notified the appropriate congressional committees of the proposed expenditure. For the reasons stated below, we believe such a requirement is an unconstitutional condition on the President's authority to conduct covert activities abroad pursuant to the President's constitutional responsibilities, including his responsibility to safeguard the lives and interests of Americans abroad.

Title 22, section 2422, of the United States Code, prohibits the expenditure of funds

> by or on behalf of the Central Intelligence Agency for operations in foreign countries, other than activities intended solely for obtaining necessary intelligence, unless and until the President finds that each such operation is important to the national security of the United States.

The proposed amendment would further limit the President's ability to conduct certain intelligence activities important to the national security of the United States. It would add as a proviso to section 502 of the

258

National Security Act, 50 U.S.C. § 414, a requirement that "no funds from the Reserve for Contingencies may be expended for any operation or activity for which the approval of the President is required by section 662 of the Foreign Assistance Act of 1961 (22 U.S.C. § 2422), or for any significant change to such operation or activity, for which prior notice has been withheld."

We believe the proposed amendment is unconstitutional because it would oblige the President to notify Congress of *any and all* covert actions to be funded out of the Reserve for Contingencies, regardless of the circumstances. It would apply even if the President is directing an extremely sensitive national security activity within his exclusive responsibility under the Constitution. We need not define all that is comprehended within the grant to the President of "the executive Power ... of the United States of America," U.S. Const. art. II, § 1. At a minimum, that power encompasses the authority to direct certain covert actions without first disclosing them to Congress, among which are those actions necessary to protect the lives and property of Americans abroad. Early judicial recognition of this authority of the President to take action to protect Americans abroad came during a mid-nineteenth century revolution in Nicaragua. On the President's orders, a naval gunship bombarded a town where a revolutionary government had engaged in violence against Americans and their property. Of this action it was said:

> As the executive head of the nation, the president is made the only legitimate organ of the general government, to open and carry on correspondence or negotiations with foreign nations, in matters concerning the interests of the country or of its citizens. It is to him, also, the citizens abroad must look for protection of person and of property ....
>
> Now, as it respects the interposition of the executive abroad, *for the protection of the lives or property of the citizen, the duty must, of necessity, rest in the discretion of the president.*

*Durand v. Hollins*, 8 F. Cas. 111, 112 (C.C.S.D.N.Y. 1860) (No. 4186) (emphasis added). At least to the extent the amendment would limit that authority, it is unconstitutional.

The courts have also recognized that the President must be able to act secretly in order to meet his constitutional responsibilities in foreign affairs. In *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320-21 (1936), the Court expressly endorsed President Washington's refusal to provide the House of Representatives with information about treaty negotiations even after the negotiations had been concluded. A fortiori, such information could be withheld during the negotiations.

259

The Court has more recently emphasized that the core presidential responsibility for protecting confidential national security interests extends beyond matters concerning treaties and into diplomatic and military secrets such as covert actions. *United States v. Nixon*, 418 U.S. 683, 712 n.19 (1974) (recognizing the "President's interest in preserving state secrets"). This conclusion is rooted in the original conception of the President's Office, as described by John Jay in the Federalist. There, he spoke of the need for "perfect *secrecy* and immediate *dispatch*" in the field of diplomacy and intelligence gathering.[1] He continued:

> The convention have done well, therefore, in so disposing of the power of making treaties that although the President must, in forming them, act by the advice and consent of the Senate, yet *he will be able to manage the business of intelligence in such manner as prudence may suggest.*

*Id.* at 392-93 (emphasis added).

We believe that because the Constitution permits the President, where necessary, to act secretly to achieve vital national security objectives abroad, a rigid requirement of prior notice for covert operations impermissibly intrudes upon his constitutional authority.

As the *Durand* court recognized, the grant of executive power is the principal textual source of the President's discretion to act for the Nation in foreign affairs. From the First Congress on, this grant has been construed to afford the President discretion to act in the field of foreign affairs. This broad power in matters of foreign policy stands in contrast to his comparatively limited authority to act alone in the domestic context. President Washington, for example, asserted the President's prerogative to communicate with Citizen Genet when he sought something for a consul, and addressed that request to "the Congress of the United States." It was President Washington who asserted the President's authority to determine the status of foreign representatives when he later demanded Citizen Genet's recall. President Washington also determined, without consulting Congress, that the United States would remain impartial in the war between France and Great Britain; he also refused to share with the House of Representatives sensitive information about the negotiation of the Jay Treaty with Great Britain. The First Congress recognized that the conduct of our foreign affairs was to be primarily the responsibility of the President, and for that reason located the State Department in the executive branch. The Supreme Court has recognized that the President alone is empowered to negotiate with foreign countries on behalf of the United States. In *Curtiss-Wright*, 299 U.S. at 319, the Court stated:

---

[1] *The Federalist*, No 64, at 392 (John Jay) (Clinton Rossiter ed , 1961).

> Not only ... is the federal power over external affairs in origin and essential character different from that over internal affairs, but participation in the exercise of the power is significantly limited. In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation. He *makes* treaties with the advice and consent of the Senate; but he alone negotiates. Into the field of negotiation the Senate cannot intrude; and Congress itself is powerless to invade it.

*Id.* These examples could be expanded upon, but all buttress the conclusion that the President's authority with respect to foreign affairs is very broad, and that certain foreign affairs powers, such as the power to act (secretly if need be) to protect Americans abroad, inhere in his Office.

Congress attempts to justify under its power of the purse requiring prior notification of all covert actions to be paid for out of the Reserve for Contingencies. Congress's authority incident to its power over the purse is broad, and generally includes the power to attach conditions to appropriations, but its power is by no means limitless. For example, Congress appropriates money for all federal agencies in all three branches of government. But the fact that Congress appropriates money for the Army does not mean that it can constitutionally condition an appropriation on allowing its armed services committees to have tactical control of the armed forces. Nor does it follow from Congress' legislative establishment of executive branch departments and its appropriation of money to pay the salaries of federal officials that Congress can constitutionally condition creation of a department or the funding of an officer's salary on being allowed to appoint the officer. Interpreting the appropriations power in this manner would in effect transfer to Congress all powers of the branches of government. The Framers' carefully worked out scheme of separation of powers, of checks and balances, would be rendered meaningless. Accordingly, however broad the Congress' appropriations power may be, the power may not be exercised in ways that violate constitutional restrictions on its own authority or that invade the constitutional prerogatives of other branches. As the Supreme Court has said, "Lacking the judicial power given to the Judiciary, [Congress] cannot inquire into matters that are exclusively the concern of the Judiciary. *Neither can it supplant the Executive in what exclusively belongs to the Executive.*" *Barenblatt v. United States,* 360 U.S. 109, 112 (1959) (emphasis added).

This well-established doctrine of unconstitutional conditions further prevents Congress from using its power over the appropriation of public funds to attach conditions to executive branch appropriations requiring the President to relinquish his constitutional discretion in foreign affairs. Just as an individual may not be required to waive his constitutional

rights as a condition of accepting public employment or benefits, so the President cannot be compelled to give up the authority of his Office as a condition of receiving the funds necessary to carrying out the duties of his office.[2]

Congress has also justified such reporting requirements on the basis of its need for information to carry out its legislative function. This oversight power, however, is neither explicit, *McGrain v. Daugherty*, 273 U.S. 135, 161 (1927), nor "unlimited," *Watkins v. United States* 354 U.S. 178, 187 (1957). It can be exercised only to further a legitimate legislative function traceable to one of Congress' enumerated powers. *See McGrain*, 273 U.S. at 173-74. There is no enumerated power in the Constitution giving Congress the authority to require the President first to report to a congressional committee prior to undertaking covert activities which are exclusively within his province. Any legislative purpose that would be served by informing Congress about a covert action can be served by notice after the covert action has been initiated or completed.[3]

Moreover, even in cases in which it can be assumed that Congress has a legitimate legislative basis for the requested information, it does not follow that the President invariably should give Congress prior notice of certain covert actions. As President Tyler recognized in 1843, "[i]t can not be that the only test is whether the information relates to a legitimate subject of [congressional] deliberation." 4 James D. Richardson, *Messages and Papers of the Presidents* 220, 223 (1897). A President is under no obligation to communicate information to Congress if to do so would impair his ability to execute his own constitutional duties. *United States v. Nixon*, 418 U.S. 683, 710 (1974). Under some circumstances, prior notice to Congress could well frustrate the President's ability to discharge those duties.

In concluding that the amendment is unconstitutional, we are not denying that Congress has a legitimate role in the formulation of American foreign policy. Nor are we denigrating the value of consulting with members of Congress prior to the initiation of a covert operation. We simply believe Congress does not require prior notification of all intelligence activities paid for out of the Reserve for Contingencies in order to perform its legislative function. Therefore, it lacks the constitutional authority to impose a rigid requirement of notice in all circumstances.

---

[2] The doctrine of unconstitutional conditions has wide application throughout the law For a good general statement of the doctrine, see *Frost & Frost Trucking Co v. Railroad Commission*, 271 U.S. 583, 594 (1926)

> If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel the surrender of all It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence.

[3] For instance, post-action notification will suffice to inform Congress about actions of foreign nations and merchants so that it may regulate "foreign commerce"

## Conclusion

We conclude that a requirement of prior notice for all covert operations funded from the Reserve for Contingencies unconstitutionally infringes on the President's constitutional responsibilities, including his duty to safeguard the lives and interests of Americans abroad.

WILLIAM P. BARR
*Assistant Attorney General*
*Office of Legal Counsel*