SPRINGFIELD FIRE & MARINE INS. CO. v. HOLMES, Auditor and Ex Officio Commissioner of Insurance of Montana.

No. 1550.

District Court, D. Montana, Helena Division.
March 16, 1940.

966

Howard Toole and W. T. Boone, both of Missoula, Mont., for plaintiff.

Harrison J. Freebourn, Atty. Gen., of Montana, and Lee Metcalf, Asst. Atty. Gen., of Montana, for defendant.

Before HANEY, Circuit Judge, and PRAY and BALDWIN, District Judges.

PER CURIAM.

This action in equity is brought for the purpose of testing the constitutionality of Chapter 95 of the Laws passed by the Twenty-fifth Legislative Assembly, in regular session, of the State of Montana, as interpreted by the Attorney General of that state, and as so interpreted threatened to be enforced against the complainant herein by the defendant as State Auditor and Ex Officio Insurance Commissioner of'the State of Montana.

In its Bill of Complaint complainant prays:

1: That the aforesaid Chapter 95 of the Laws of Montana, 1937, insofar as it requires that an agent of this complainant locally licensed and resident within the State of Montana shall receive the full commission on all policies of insurance made, written or placed, or caused to be made, written or placed, upon insurable risks resident, situated or located within the State of Montana, and insofar as it prohibits this complainant from paying a portion of such commission on such insurance to agents and brokers in various other states of the United States, shall be declared to be void, invalid and unconstitutional and in conflict with the Fifth and Fourteenth Amendments to the Constitution of the United States;

2: That the said Chapter 95 of the Laws of Montana, 1937, aforesaid, insofar as it undertakes to empower and authorize the defendant to suspend this complainant's certificate of authority to do business in the State of Montana because of its refusal to pay the full commission to such resident agents and because of payment of a part of the commission to non-resident agents and brokers, be declared to be void, invalid and unconstitutional and in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States; and,

3: That the defendant John J. Holmes as State Auditor and Ex Officio Commissioner of Insurance of the State of Montana, and all of his representatives, servants, employees, and their respective succes-

sors in office, and all persons acting under their authority, may be perpetually and forever restrained and enjoined from suspending or attempting to suspend this complainant's right to do business in the State of Montana or from cancelling or setting aside this complainant's certificate of authority so to do or from taking any further steps to that end, and that the said defendant be perpetually enjoined and restrained from refusing to renew this complainant's certificate of authority from time to time as provided by law, or from in any manner suspending, attempting to suspend, or otherwise interfering with the business of this complainant so long as this complainant shall comply with the requirement of the Laws of the State of Montana excepting the provisions of Chapter 95 of the Laws of Montana, 1937, hereinbefore referred to.

The parts of the act referred to material to the decision of the case in hand are as follows:

"Be it enacted by the Legislative Assembly of the State of Montana:

"Section 1. It shall be unlawful for any insurance company * * * doing business within the State of Montana * * * to make, write, place, or cause to be made, written or placed in this State, any policy, bond, duplicate policy, contract of insurance or contract of indemnity of any kind or character, or any general floating group policy upon persons or property, or upon any insurable risk, resident, situated or located in this State, *unless written through and countersigned by an agent of this State, duly licensed to transact insurance, bonding or indemnity business therein.* [Emphasis supplied.]

"A resident agent shall countersign all policies, bonds or contracts of indemnity so issued, *and shall receive the full commission on all such policies, bonds or contracts of insurance on indemnity, when the premium is paid* [emphasis supplied], to the end that the State may receive the tax required by law to be paid on the premiums collected for insurance on all persons, property or other insurable risks resident, situated or located within this State; provided that nothing in this act shall be construed to prevent any insurance company or association from issuing policies, bonds or contracts [of insurance] at its principal or department offices, covering property or persons or other insurable or indemnity risks resident, situated or located in this State; *provided, however, such policies are issued upon ap-plication procured and submitted to such company or association by a resident agent, who shall keep a record of all such policies,* bonds or contracts of indemnity *so issued, and countersign the same, and that said resident agent or agents shall receive the full commission on all policies when premium is paid. It shall be unlawful for any such resident agent to rebate or divide such commission, with intent to evade the provisions of this act; and any violation of this provision shall be punished as provided in Sections 6123 and 6124 Revised Codes of Montana 1935.* [Emphasis supplied.] * * *

"Section 2. Exceptions. * * *

"Section 3. Penalties. Any * * * fire insurance company * * * wilfully failing to observe or comply with the provisions of this act shall be guilty of a misdemeanor and shall be subject to and liable to pay a penalty of five hundred dollars ($500.00) for each violation thereof, and for each failure to observe and comply with the provisions of said section, after notice and hearing by the state commissioner of insurance, in the same manner as provided by law for the investigation and punishment by the state commissioner of insurance for other infractions and violations of the insurance laws of this State. * * *

"*After such notice and hearing the commissioner of Insurance may, in his discretion, revoke the certificate of authority issued to any corporation, society or agent on his being satisfied, after notice and hearing as provided by law, that such corporation, society or agent has violated any of the provisions of this Act. This penalty is in addition to the other penalties herein described.* [Emphasis supplied] * * *

"Section 4. Any insurance * * * corporation * * * whose authority to transact business in this State shall have been so revoked shall not again be authorized or permitted to transact business within the State of Montana until it shall have paid the amount of any fine or fines assessed * * * *and shall have filed in the office of the state auditor a certificate signed by its president or other chief executive officer to the effect that the terms and obligations of the provisions of this act are accepted by it as part of the conditions of its right and authority to transact business in this State.*" (Emphasis supplied.)

This cause came regularly on for hearing on plaintiff's motion for a temporary injunction, before a Three Judge Court, the Hon-

orable Bert Emery Haney, one of the Judges of the United States Circuit Court of Appeals, Ninth Circuit, the Honorable Charles N. Pray and the Honorable James H. Baldwin, United States District Judges, District of Montana, judges presiding, as provided by the Act of June 18, 1910, c. 309, Sec. 17, 36 Stat. 557, as amended, Sec. 380 of Title 28, U.S.C.A. Thereupon a stipulation of facts was filed and presented to the Court, and counsel for plaintiff introduced in evidence, without objection, a copy of an Order to Show Cause made by said John J. Holmes as State Auditor and Commissioner of Insurance Ex Officio of the State of Montana on September 7, 1938, in re Revocation State Insurance Department License No. 2211, addressed to the complainant Springfield Fire and Marine Insurance Company, a corporation, and requiring it "by and through its officers, or counsel, or otherwise, to appear before the said State Auditor and Ex Officio Commissioner of Insurance in and for the State of Montana * * * there to show cause why Montana Insurance Department License No. 2211 heretofore issued to the said Springfield Fire & Marine Insurance Company, a corporation, should not be cancelled, vacated, set aside and held for naught", certified by said John J. Holmes as State Auditor and Commissioner of Insurance Ex Officio of the State of Montana to be "a true, full, complete and exact copy of Order to Show Cause entered against the Springfield Fire & Marine Insurance Company as the same appears in my office of which I am the legal keeper".

The case was argued by counsel for the parties litigant and submitted to and taken under advisement by the Court on the merits, on the pleadings, the stipulation of facts so filed and said copy of Order to Show Cause so certified.

The Pleadings:

It is alleged in the Bill of Complaint, and expressly admitted by the Answer, that:

1: The complainant, Springfield Fire & Marine Insurance Company, is a corporation duly organized and existing under and by virtue of the laws of the State of Massachusetts, and a citizen of the State of Massachusetts, and a resident of the State and District of Massachusetts;

2: That complainant, as such corporation, is duly entered and qualified to do and carry on the business of writing, underwriting, placing, soliciting and otherwise engaging in the fire insurance business and in making, placing and executing fire insurance contracts in the various states of the United States, and particularly within the State of Montana;

3: Complainant is and for many years has been duly qualified to do business in the State of Montana and engaged in soliciting, making, writing and placing policies and contracts of fire insurance upon property and insurable risks resident, situated and located in the State of Montana;

4: The defendant, John J. Holmes, is the duly elected, qualified and acting State Auditor of the State of Montana and as such is designated by law as Commissioner of Insurance of the State of Montana under the provisions of Section 162 of the Revised Codes of Montana, 1935, and as such Commissioner of Insurance is a citizen and resident of the State of Montana;

5: Section 6112 of the Revised Codes of Montana, 1935, provides in part as follows:

"All insurance corporations, associations, and societies, as hereinbefore specified in the preceding section, before commencing to do business in the state of Montana, shall be required to secure a license, authorizing them to transact business of insurance corporations, associations, or societies, and shall pay to the state auditor, for such license, the following fees: * * *

"For a license to collect in any one year premiums over the sum of five thousand dollars, the sum of twenty dollars for each and every one thousand dollars to be so collected; * * *".

6: Section 6113 of the Revised Codes of Montana, 1935 provides: "The state auditor, upon the payment of the fees enumerated in the preceding section, or, after the deductions have been made, as above provided for, shall issue, in duplicate, a license, as therein provided, a copy of which shall be forthwith filed in his office."

7: Section 6114 of the Revised Codes of Montana, 1935 provides as follows: "All licenses issued under this act shall expire on the 31st day of March of each year."

8: Section 6115 of the Revised Codes of Montana, 1935 provides as follows: "Nothing in this act shall be construed into permitting any insurance corporation, association, or society to do business in the state of Montana, even when in posses-

sion of the license provided for herein, unless such corporation, association, or society shall have complied with the laws of the state of Montana now in force, or which may hereafter be enacted."

9: Section 166 of the Revised Codes of Montana, 1935, provides in part: "The commissioner of insurance shall examine and inquire into violations of insurance laws of this state. * * * For the purposes of the examinations, inquiries, or investigations as aforesaid, the commissioner of insurance or his deputy, or the person authorized to make them, shall have free access to all books and papers of an insurance company that relate to its business, and the books and papers kept by any officer, agent, or employee relating to, or upon which any record of its business is kept, and may summon witnesses and administer oaths or affirmations, in the examination of the directors, trustees, officers, agents, or employees of any such company, and any other person in relation to its affairs, transactions, and conditions. He may require and compel the production of records, books, papers, contracts, or other documents by attachments, if necessary."

10: Section 167 of the Revised Codes of Montana, 1935 provides in part as follows: "If the commissioner finds upon examination, hearing, or other evidence, that any insurance company * * * organized in this state, or in any other state, territory, or foreign country, * * * has failed to comply with the law or with the provisions of its charter * * * or if its officers or agents refuse to submit to examination, or to perform any legal obligation relative thereto * * * he shall suspend or revoke all certificates of authority granted to said insurance company, and to its officers or agents."

11: Section 6118 of the Revised Codes of Montana, 1935, provides among other things, that before transacting any fire insurance business every agent of such corporation shall procure annually a certificate of authority or license as agent and further providing that the Commissioner of Insurance is prohibited from issuing a certificate of authority or license to any person or agent unless such person or agent is a legal resident of the State of Montana at the time such certificate of authority is issued. That said Section 6118 further provides that such certificates of

authority or licenses shall expire on the 31st day of March of each year;

12: The Twenty-fifth Legislative Session of the State of Montana passed Chapter 95 of the Laws of 1937 which provides as follows:

"Section 1. It shall be unlawful for any insurance company or association, including life, fire, casualty, surety or indemnity corporations or associations doing business within the State of Montana (except so-called assessment life insurance companies, as hereinafter provided, and fraternal benefit societies and rural mutual insurance companies) to make, write, place, or cause to be made, written or placed in this State, any policy, bond, duplicate policy, contract of insurance or contract of indemnity of any kind or character, or any general floating group policy upon persons or property, or upon any insurable risk, resident, situated or located in this State, unless written through and countersigned by an agent of this State, duly licensed to transact insurance, bonding or indemnity business therein.

"A resident agent shall countersign all policies, bonds or contracts of indemnity so issued, and shall receive the full commission on all such policies, bonds or contracts of insurance on indemnity, when the premium is paid, to the end that the State may receive the tax required by law to be paid on the premiums collected for insurance on all persons, property or other insurable risks resident, situated or located within this State; provided that nothing in this act shall be construed to prevent any insurance company or association from issuing policies, bonds or contracts at its principal or department offices, covering property or persons or other insurable or indemnity risks resident, situated or located in this State; provided, however, such policies are issued upon application procured and submitted to such company or association by a resident agent, who shall keep a record of all such policies, bonds or contracts of indemnity so issued, and countersign the same, and that said resident agent or agents shall receive the full commission on all policies when premium is paid. It shall be unlawful for any such resident agent to rebate or divide such commission, with intent to evade the provisions of this act; and any violation of this provision shall be punished as provided in Section 6123 and 6124 Revised Codes of Montana 1935. Provided, however, that

the signature of a resident agent on an application for a life insurance policy shall be deemed a countersigning of the policy if a copy of such application is attached to the policy."

"Section 3. Penalties. Any life insurance companies, fire insurance companies, surety or indemnity companies or associations wilfully failing to observe or comply with the provisions of this act shall be guilty of a misdemeanor and shall be subject to and liable to pay a penalty of five hundred dollars ($500.00) for each violation thereof, and for each failure to observe and comply with the provisions of said section, after notice and hearing by the state commissioner of insurance, in the same manner as provided by law for the investigation and punishment by the state commissioner of insurance for other infractions and violations of the insurance laws of this State. Such fines and penalties shall be handled and disposed of by the state commissioner of insurance in the same manner as license fees are now handled and disposed of by said commissioner.

"After such notice and hearing the commissioner of insurance may, in his discretion, revoke the certificate of authority issued to any corporation, society or agent on his being satisfied, after notice and hearing as provided by law, that such corporation, society or agent has violated any of the provisions of this act. This penalty is in addition to the other penalties herein described.

"Any corporation, society or agent whose certificate of authority has been revoked may, within fifteen (15) days thereafter, appeal from said order to any district court of this State having jurisdiction over the persons, corporations or agents concerned.

"Section 4. Any insurance company, indemnity corporation or surety corporation or association whose authority to transact business in this State shall have been so revoked shall not again be authorized or permitted to transact business within the State of Montana until it shall have paid the amount of any fine or fines assessed by the state commissioner of insurance, and shall have filed in the office of the state auditor a certificate signed by its president or other chief executive officer to the effect that the terms and obligations of the provisions of this act are accepted by it as part of the conditions of its right and authority to transact business in this State."

13: Section 6123 of the Revised Codes of Montana, 1935, provides as follows: "Every officer or agent of any such corporation, who shall violate any of the provisions of this act, shall be deemed guilty of a misdemeanor."

14: Section 6124 of the Revised Codes of Montana, 1935, provides as follows:

"Whenever it shall appear to the satisfaction of the commissioner of insurance after a hearing before him upon notice, that any company, officer, agent, solicitor or helper has violated any provision of this act, he shall suspend the license of any such company, officer, agent, solicitor or helper to transact business in this state for a period of sixty (60) days for the first offense, and for a period of from not less than one year to not more than three years in the discretion of the commissioner of insurance, for the second or any additional offenses, and no other license shall be issued to any such company, officer, agent, solicitor, or helper during the period of suspension, as the case may be."

15: That at all times during the years 1936 and 1937 and in the years prior thereto, and at the present time for the year 1938, this complainant was, is and has been the owner of a certificate of authority to transact business within the State of Montana as provided in the statutes above set forth, and complainant has during said years and for many years past and now is engaged in the State of Montana and in other states of the United States in making, writing and placing insurance, and particularly fire insurance, upon insurable risks resident, situated and located in the State of Montana;

16: J. H. Heilbronner Company is one of the duly licensed resident agents in the State of Montana, residing at Butte, Montana, of this complainant, holding a license as such resident agent issued by the State of Montana;

17: E. L. Dee is one of the duly licensed resident agents in the State of Montana, residing at Butte, Montana, of this complainant, holding a license as such resident agent issued by the State of Montana;

18: On the 29th day of July, 1938, the defendant herein, John J. Holmes, State Auditor and Ex Officio Commissioner of Insurance of the State of Montana, directed a letter to this complainant, a copy of which is hereto attached marked Ex-

hibit C and by reference thereto made a part hereof;

- Said letter so directed and marked as aforesaid is in words and figures as follows:

"State of Montana
Office of
John J. Holmes
State Auditor
Commissioner of Insurance
Investment Commissioner
State Fire Marshal
Helena, Montana
July 29, 1938

"Springfield Fire & Marine Ins. Co.
"114 Sansome Street
"San Francisco, California
"Attention—H. K. Norris, Agency Supervisor

"Dear Sir:

·"The Montana Insurance Department has been contacted by the J. H. Heilbronner Company relative to your Company's contract No. 193342, Anaconda Copper Mining Company. The Department has reviewed your letter of July 14th wherein you state that the contract has been returned for cancellation as of date of issue.

"The Department is interested in learning if your Company reissued a new contract in the amount of the canceled contract and covering the same risks, and, if so, what agency plant in the State of Montana countersigned the issued policy.

"Kindly advise the Department fully as to the above mentioned inquiry.

"The Department trusts that you will give this matter your prompt attention.

"Very truly yours,
"John J. Holmes
"State Auditor and Ex Officio
Insurance Commissioner.
"By
"(Signed) J. D. Kelley
"Deputy Insurance Commissioner.
"JDK:CB"

19: On the 1st day of September, 1938, this complainant directed to said defendant its answer to said letter, which answer is fully set out in the Order to Show Cause, copy of which is hereto attached marked Exhibit D and by reference thereto made a part hereof;

Said letter so directed and marked as aforesaid is in words and figures as follows:

"Missoula, Montana
"September 1, 1938
"Hon. John J. Holmes,
"State Auditor and Ex Officio
"Commissioner of Insurance,
"Helena, Montana
"Dear Sir:

"Under date of July 29 you addressed a letter to Springfield Fire and Marine Insurance Company, 114 Sansome Street, San Francisco, California, wherein you referred to Springfield Fire and Marine Insurance Company policy No. 193342 covering certain of the properties of the Anaconda Copper Mining Company.

"I am authorized by Springfield Fire and Marine Insurance Company to advise you that its policy No. 193342 covering $852,800.00 in properties of Anaconda Copper Mining Company dated December 31, 1937, was cancelled flat as of date of issue by Springfield Fire and Marine Insurance Company and that a new policy dated back to the date of issue of the first policy was written by another agent of Springfield Fire and Marine Insurance Company covering the same risk for the same amount.

"Your letter of July 29 states that you were contacted by agent J. H. Heilbronner Company and since J. H. Heilbronner Company participated in the first policy which was cancelled but did not participate in the second policy issued, it is anticipated that your inquiry was made for the purpose of determining whether or not in writing the second policy Springfield Fire and Marine Insurance Company complied with the provisions of Chapter 95 of the Laws of Montana, 1937, in payment of the full commission as interpreted by the Attorney General of Montana in his opinion of April 25, 1938.

"It is the policy of Springfield Fire and Marine Insurance Company to comply with all of the valid laws of the State of Montana and to give your office all information covering any of the business done in Montana by the company. However, Springfield Fire and Marine Insurance Company takes the position that Chapter 95 of the Laws of 1937 is unconstitutional under the Fourteenth Amendment of the Constitution of the United States and that the company was entirely within its rights

in cancelling its policy No. 193342 and issuing another policy in lieu thereof.

"So that you may be fully advised as to the reason for cancellation of the first policy you are informed that policy No. 193342 was solicited by an insurance broker, and that the Anaconda Copper Mining Company directed that broker to obtain insurance coverage upon certain of its properties located within and without the State of Montana, the amount of the properties then to be covered by that policy being valued at $852,800.00 for insurance purposes. Of those properties 83.9 per cent were located within the State of Montana and 16.1 per cent outside of the State of Montana.

"The broker in question was not a resident of the State of Montana and while 83.9 per cent of the property was situated within the State of Montana the broker nevertheless solicited the business at offices of the Anaconda Copper Mining Company outside of the State of Montana and that broker rendered to Springfield Fire and Marine Insurance Company engineering, inspection and agency services equal in value to 10 per cent of the gross premium. The broker collected the premium from the Anaconda Copper Mining Company and after deducting therefrom 10 per cent for the services so rendered remitted to J. H. Heilbronner Company that portion of the premium represented by $352,800 of the coverage provided in the policy. Simultaneously the broker furnished J. H. Heilbronner Company with a receipted bill for 10 per cent of that portion of the premium for the services rendered and it then became the duty of J. H. Heilbronner Company to first deduct five per cent from its share of the gross premium and remit the balance to Springfield Fire and Marine Insurance Company. Mr. Heilbronner refused to do this but offered to remit the balance of his share of the premium after deducting 15 per cent therefrom.

"Upon refusal of J. H. Heilbronner Company to remit his portion of the premium less five per cent the policy was cancelled by Springfield Fire and Marine Insurance Company and the broker had same re-written through another resident agency in Montana, dating the policy back to the original date, who was willing to permit the service charge of 10 per cent to be paid to the non-resident broker and to accept five per cent as the resident agent's commission.

"This situation squarely raises the question as to whether or not a resident agent in Montana of a qualified insurance company may accept five per cent of the premium as his commission in cases where a non-resident broker, having serviced, solicited, engineered, inspected and forwarded the business takes 10 per cent of the premium as a charge for the services so rendered by him.

"We are aware that the Attorney General of Montana has held in his opinion of April 25, 1938, that such a transaction is invalid under the provisions of Chapter 95 of the Laws of Montana, 1937, but Springfield Fire and Marine Insurance Company differs with the Attorney General and takes the position that that law is unconstitutional and you are therefore advised that the second policy written is now in full force and effect and that it is the intention of Springfield Fire and Marine Insurance Company to maintain it in full force and effect until its expiration date and also to write other insurance in Montana through non-resident brokers on the same basis.

"Yours very truly,
"Toole & Boone
"By /s/ Howard Toole
"Attorneys for Springfield Fire
 & Marine Insurance Co.
"T :p"

19: On the 7th day of September, 1938, the defendant herein served upon this complainant an Order to Show Cause, which is hereto attached as Exhibit D, above referred to;

20: As appears in said Order to Show Cause the defendant herein has charged this complainant with knowingly and intentionally aiding and abetting violations of the provisions of Chapter 95 of the Laws of Montana, 1937, and knowingly and intentionally conducting its fire insurance business within the State of Montana with an intent to evade and defeat the express provisions of said Chapter 95 of the Laws of 1937, and this complainant has been by said defendant in said Order to Show Cause directed and ordered to appear before the defendant as Commissioner of Insurance in his office in Helena, Montana, on September 28, 1938, there to show cause why this complainant's Montana Insurance Department license and certificate of authority to do business within the State of Montana should not be cancelled, vacated, set aside and held for

naught because of the alleged violations of the provisions of Chapter 95 of the Laws of Montana, 1937;

21: The said defendant John J. Holmes as State Auditor and Ex Officio Commissioner of Insurance asserts that Chapter 95 of the Laws of Montana 1937 is valid legislation and binding upon this complainant and that under the provisions of said law it is and has become his duty to cancel, vacate and set aside the certificate of authority of this complainant and to deprive this complainant of the right to do business within the State of Montana;

22: The reason of said defendant in the issuance of said Order to Show Cause is that the said defendant maintains and asserts that this complainant has been, is, and will be violating the provisions of Chapter 95 of the Laws of Montana 1937 because of its failure and refusal to pay unto its agents resident within the State of Montana the full commission upon insurance covering insurable risks resident, situated and located in the State of Montana upon policies of insurance forwarded to such resident agents by non-resident agents and brokers who have solicited, obtained and made and placed such insurance under agreements made outside of the State of Montana whereby such non-resident agents or brokers receive a portion of the commission for services rendered by them;

23: This complainant has advised the defendant that Chapter 95 of the Laws of Montana 1937 is void, invalid and unconstitutional because it violates the provisions of the Fifth and Fourteenth Amendments of the Constitution of the United States in that:

The State of Montana has no right or power whatsoever to control, regulate or prohibit this complainant's contracts, agreements or arrangements made outside of the State of Montana concerning compensation of its agents or brokers who do not reside within the State of Montana for services rendered wholly outside of the State of Montana;

The State of Montana has no right whatsoever to require that the resident agents within the State of Montana shall receive the full commission on all policies of insurance when the premium is paid; and,

The State of Montana has no right whatsoever to control, regulate or pro-hibit this complainant's contracts, agreements or arrangements made inside of the State of Montana concerning compensation of its resident agents;

24: Complainant further alleges that this is a suit of a civil nature in equity arising under the Constitution of the United States and that the matter in controversy exceeds, exclusive of interests and costs, the sum of three thousand dollars ($3,000);

25: Complainant further alleges that unless restrained by this Honorable Court the defendant as State Auditor and Ex Officio Commissioner of Insurance of the State of Montana will on September 28, 1938, cancel, vacate and set aside this complainant's certificate of authority or license to carry on its insurance business within the State of Montana and will refuse to renew this complainant's present certificate of authority and will suspend this complainant and deprive it indefinitely of the right to carry on its business within the State of Montana;

26: Unless the said defendant is restrained by this Honorable Court this complainant's valuable right to do business in the State of Montana and this complainant's valuable business within the State of Montana will be wholly lost and destroyed since this complainant could not after such cancellation continue to do business within the State of Montana in view of the provisions of Chapter 95 of the Laws of Montana 1937 and the penalties therein contained;

27: In view of the fact that the said defendant intends to cancel, vacate and set aside this complainant's certificate of authority on September 28, 1938, immediate and irreparable loss and damage to this complainant will result from this cancellation and will continue to result therefrom and such irreparable loss and damage will result from the cancellation of this complainant's certificate of authority before this matter can be heard on an application for an interlocutory injunction after notice as required by the provisions of Section 380 of Title 28 of the United States Codes Annotated;

28: This complainant has an agency plant within the State of Montana wherein it has agency contracts with numerous local fire insurance agents within the State of Montana, and that each and every one of said agents is daily soliciting, writing and placing insurance with this complain-

974

ant upon insurable risks within the State of Montana;

29: The said business and agency plant is of great value, to-wit, in excess of ten thousand dollars ($10,000), and has been created by this complainant at great expense, and that the continued ability of this complainant to carry on its insurance business within the State of Montana is dependent upon the uninterrupted solicitation of such business by its said agents;

30: If the defendant shall cancel or revoke the certificate of authority of this complaint such revocation or cancellation will automatically result in the revocation and cancellation of all of the local licenses issued to such resident agents and will immediately interrupt and destroy the right of this complainant and its said agents to continue to do business within the State;

31: The insurance business of this complainant within the State of Montana is increasing and that complainant's net premium retentions are and will be in excess of the sum of ten thousand dollars ($10,000) during the year 1938 and by reason thereof a great and irreparable damage, injury and loss will be suffered by this complainant unless there shall issue out of this Honorable Court a temporary restraining order to remain in force until the hearing and determination of complainant's application for an interlocutory injunction;

32: By reason of the fact that this complainant has and will have numerous policies of insurance outstanding and in effect in the State of Montana wherein a part of the commission has been paid or will be paid to agents or brokers outside of the State of Montana and wherein the resident agent within the State of Montana has not and will not receive the full commission, there will be a multiplicity of suits involving this complainant wherein the certificate of authority of this complainant will be challenged and threatened with cancellation; and,

33: This complainant has no plain, speedy or adequate remedy in the ordinary course of law.

Order to Show Cause and Findings of Fact:

It is stated in the Order to Show Cause, and the Court finds that the facts upon which the same was based and issued are as follows, to-wit:

1: That on the 1st day of April, 1938, the Springfield Fire and Marine Insurance Company, a corporation, did make requisition for, and did have issued to it, that certain Montana Insurance Department License numbered 2211, wherein and whereby the said Springfield Fire and Marine Insurance Company, a corporation, was duly licensed to conduct the business of fire insurance within the State of Montana for the year beginning April 1, 1938, and ending March 31, 1939, which said license was, at all times herein mentioned, and now is, in full force and effect;

2: That at all times herein mentioned Chapter 95, Laws of Montana 1937, was, and now is, in full force and effect, which said Chapter, inter alia, provides that:

"It shall be unlawful for any insurance company * * * doing business within the State of Montana * * * to make, write, place, or cause to be made, written or placed in this State, any policy, * * * contract of insurance * * * upon any insurable risk, resident, situated or located in this State, unless written through and countersigned by an agent of this State, duly licensed to transact insurance, * * * business therein.

"A resident agent shall countersign all policies, * * * and shall receive the full commission on all such policies * * * when the premium is paid, * * * provided that nothing in this act shall be construed to prevent any insurance company * * * from issuing policies * * * at its principal or department offices, covering property * * * situated or located in this State; provided, however, such policies are issued upon application procured and submitted to such company or association by a resident agent, who shall keep a record of all such policies * * * and countersign the same, and that said resident agent * * * shall receive the full commission on all policies when premium is paid. It shall be unlawful for any such resident agent to rebate or divide such commission, with intent to evade the provisions of this act; * * *." Section 1.

3: That on, to-wit, the 29th day of July, 1938, J. H. Heilbronner, a duly licensed Montana agent for the Springfield Fire and Marine Insurance Company, a corporation, did complain to the Montana Insurance Department that the said Springfield Fire and Marine Insurance Company, a corporation, had wholly failed and refused to comply with the provisions of Chapter 95, Laws

of 1937, in that the said Springfield Fire and Marine Insurance Company did issue its certain contract of insurance, No. 193342, and did cause the same to be countersigned by its licensed agent, the said J. H. Heilbronner, as required by the provisions of Chapter 95, Laws of Montana 1937, but that the said Springfield Fire and Marine Insurance Company, a corporation, did wholly fail and refuse to pay to its said licensed agent, the said J. H. Heilbronner, the full commission accruing on its policy No. 193342, as provided for by Chapter 95, Laws of 1937, and that the said Springfield Fire and Marine Insurance Company, a corporation, did cause its said contract of insurance No. 193342 to be canceled flat as of date of issue, at and when its said licensed agent, the said J. H. Heilbronner, demanded that the full commission be paid, at and when the premium on said contract of insurance was paid, and that the said Springfield Fire and Marine Insurance Company, after so canceling the aforesaid policy, did then issue a new contract of insurance covering the same risk and did cause the said reissued contract of insurance be countersigned by a licensed agent, other than the said J. H. Heilbronner, which said agent did so countersign the said contract of insurance on a commission basis other than that provided for by Chapter 95, Laws of 1937, as interpreted by the Attorney General of the State of Montana, and threatened to be acted upon by the defendant herein.

4: That on, to-wit, the 22nd day of September, 1937, the Attorney General of the State of Montana rendered his official opinion to the effect that the words "full commission", as used in Chapter 95, Laws of 1937, convey the intent: "That the resident Montana agent should receive the same commission for countersigning an insurance contract as he would receive from the same business if he secured it himself."

5: That under date of November 30, 1937, the Attorney General rendered his official opinion to the effect that Chapter 95, Laws of 1937, prohibits a resident Montana agent from rebating or sharing the commission paid on any issued contract of insurance with an out of state agent forwarding the contract of insurance into the State of Montana for countersignature;

6: That on, to-wit, the 7th day of September, 1938, the Springfield Fire and Marine Insurance Company, a corporation, did, through its counsel, file with the State Auditor and Ex Officio Commissioner of Insurance in and for the State of Montana its certain communication in words and figures as follows, to-wit:

(This communication is hereinbefore set out in full and it will not be recopied here).

7: That the said Springfield Fire and Marine Insurance Company, a corporation, did, on or about December 31, 1937, at Butte, Montana, cause its duly licensed agent, J. H. Heilbronner, to countersign its certain policy of insurance No. 193342 issued and dated as of December 31, 1937, and thereafter the said Springfield Fire and Marine Insurance Company, a corporation, did fail and refuse to pay its said countersigning agent, J. H. Heilbronner, the full commission accruing on its said policy of insurance No. 193342, as required by Chapter 95, Laws of Montana 1937, as so interpreted and threatened to be acted upon, and did on, to-wit, the 14th day of July, 1938, at and when its said countersigning agent, J. H. Heilbronner, refused to accept a five per cent countersigning commission in lieu of the full commission as provided for by Chapter 95, Laws of Montana 1937, as so interpreted and threatened to be acted upon, cancel its said contract of insurance No. 193342 flat as of date of issue, and did, after so canceling its said contract of insurance No. 193342 as aforesaid, issue in lieu thereof its certain contract of insurance covering the same risk, and did cause the reissued contract of insurance to be countersigned by a duly licensed Montana agent of the said Springfield Fire and Marine Insurance Company other than the said J. H. Heilbronner, and did pay, or cause to be paid, to the said agent so countersigning the reissued contract, a commission of five per cent in lieu of the full commission accruing on the said reissued contract of insurance, as provided for by Chapter 95, Laws of Montana 1937, as so interpreted and threatened to be acted upon;

8: That the said Springfield Fire and Marine Insurance Company, a corporation, did knowingly and intentionally aid and abet a violation of the provisions of Chapter 95, Laws of Montana 1937, in that the said Springfield Fire and Marine Insurance Company did at Butte, Montana, on, to-wit, the 14th day of July, 1938, cancel its certain contract of insurance No. 193342 dated December 31, 1937, flat as of date of issue at and when its countersigning agent, J. H. Heilbronner, refused to divide the full commission accruing on the said con-

tract of insurance with an out-of-state agent or broker, and did demand that he be paid the full commission accruing on said contract of insurance, as provided by Chapter 95, Laws of Montana 1937, as so interpreted and threatened to be acted upon. And the said Springfield Fire and Marine Insurance Company, a corporation, did, after so canceling its said contract of insurance No. 193342, issue in lieu thereof its certain contract of insurance covering the same risk, and did cause the said reissued contract of insurance to be countersigned by its duly licensed Montana agent other than the said J. H. Heilbronner, and did pay or cause to be paid to said countersigning agent, for so countersigning said contract of insurance, a commission less than the full commission accruing on the said reissued contract of insurance, and did, then and there, knowingly and intentionally require and permit the said countersigning agent to divide the full commission accruing on said reissued contract of insurance with an out-of-state agent or broker, contrary to the express provisions of Chapter 95, Laws of Montana 1937, as so interpreted and threatened to be acted upon; and,

9: That in committing the acts herein complained of, the said Springfield Fire and Marine Insurance Company, a corporation, did well know the meaning and intent of Chapter 95, Laws of Montana 1937, and did knowingly and intentionally conduct its fire insurance business within the State of Montana with an intent to evade and defeat the express provisions of the said Chapter 95, Laws of Montana 1937, as so interpreted and threatened to be acted upon.

It is obvious from a reading and consideration of the admitted and proven facts that the defendant John J. Holmes as State Auditor and Ex Officio Commissioner of Insurance of the State of Montana threatens to, and unless restrained by the order of this Court will, revoke the license of the complainant here to do business within the State of Montana upon the theory that Chapter 95 of the Laws of Montana 1937 requires an insurance company to pay to its agent resident in and licensed by the State of Montana the "full commission" upon the insurance written, which, as interpreted by the Attorney General of that State and accepted by and acted upon by the defendant here, means that the agent of the insurance company resident and licensed to do business in the State of Montana who

countersigns a contract of insurance upon any insurable risk resident, situated or located in the State of Montana shall receive the same commission for countersigning the contract of insurance as he would receive for the same business if he had secured it himself (paragraph 4 of the Order to Show Cause); and that Chapter 95 of the Laws of Montana 1937 "prohibits a resident Montana agent from sharing the commission paid on any issued contract of insurance with an out-of-state agent forwarding the contract of insurance into the State of Montana for countersignature", (paragraph 5 of the Order to Show Cause).

Stated in another way, the statute involved here, as so interpreted and threatened to be enforced, means that the State has undertaken to fix exactly the amount of the commission to be paid to insurance agents resident in and licensed by the State of Montana for insurance written upon an insurable risk resident, situated or located in the State of Montana, and prohibits the insurance company writing the insurance and such resident and licensed insurance agent from dividing or paying any part of that commission with or to the non-resident insurance agent or broker who originated the business and performed necessary services of value in connection therewith as compensation for such services so rendered.

This being true, complainant contends:

1: The State of Montana cannot consistently with due process of law absolutely fix commissions of insurance agents within the State of Montana;

2: The State of Montana cannot consistently with due process of law regulate the payment of commissions to resident agents within the State of Montana in such a manner as to regulate or prohibit the payment of commissions to agents or brokers outside of the State of Montana who have rendered services of value in connection with insurance upon risks within the State of Montana;

3: The State of Montana cannot consistently with due process of law require the payment of the "full commission", within the meaning of those words as interpreted by the Attorney General of the State of Montana, and threatened to be enforced by the defendant here, to agents resident within the State of Montana;

4: Even if the State of Montana possessed the powers of regulation above referred to, which it does not possess, it

could not consistently with due process of law exercise those powers in such a way as to prohibit or regulate the payment of commissions to agents or brokers outside of the State of Montana for services of value rendered in other states by requiring the payment of the "full commission", as so interpreted and threatened to be enforced, to agents within the State of Montana; and,

5: The State of Montana cannot consistently with due process of law require the payment of the "full commission", as interpreted and threatened to be enforced, or any commission, to agents within the State of Montana for services not rendered by such agents.

The pleadings and stipulated facts in the case at bar disclose that the complainant here has in every instance, and particularly with respect to the policies in question in the instant case, complied with the provisions of Chapter 95 of the Laws of Montana 1937, which makes it unlawful "for any insurance company * * * doing business within the State of Montana * * * to make, write, place, or cause to be made, written or placed in this State, any policy, bond, duplicate policy, contract of insurance or contract of indemnity of any kind or character, or any general floating group policy * * *, upon any insurable risk, resident, situated or located in this State, unless written through and countersigned by an agent of this State, duly licensed to transact insurance, bonding or indemnity business", Section 1, with the result that the question as to whether the State of Montana has or has not the right to so regulate is not up for consideration or decision and it is not considered or decided.

██ Complainant concedes, as it must, that "since the decision in German Alliance Insurance Company v. Ike Lewis, Superintendent of Insurance of Kansas, 233 U.S. 389, 411 [34 S.Ct. 612, 58 L.Ed. 1011, L.R.A.1915C, 1189], the business of insurance is so weighted with the public interest that the State has the right to pass regulatory legislation within certain limits, not, however, to the extent of unconstitutional legislation or legislation which goes beyond the reasonable and legitimate interest of the state and its citizens." See also: Carroll v. Greenwich Ins. Co., 199 U.S. 401, 411, 26 S.Ct. 66, 50 L.Ed. 246; German Alliance Ins. Co. v. Lewis, 233 U.S. 389, 408–416, 34 S.Ct. 612, 58 L.Ed. 1011, L.R.A.

1915C, 1189; La Tourette v. McMaster, 248 U.S. 465, 468, 39 S.Ct. 160, 63 L.Ed. 362; National Union Fire Ins. Company v. Wanberg, 260 U.S. 71, 43 S.Ct. 32, 67 L. Ed. 136; Wolff Company v. Industrial Court, 262 U.S. 522, 535, 43 S.Ct. 630, 67 L.Ed. 1103, 27 A.L.R. 1280; Herbring v. Lee, 280 U.S. 111, 50 S.Ct. 49, 74 L.Ed. 217, 64 A.L.R. 1430; and, O'Gorman v. Hartford Fire Ins. Company, 282 U.S. 251, 51 S.Ct. 130, 75 L.Ed. 324, 72 A.L.R. 1163.

██ In Wolff Company v. Industrial Court, 262 U.S. 522, 535, 43 S.Ct. 630, 632, 67 L.Ed. 1103, 27 A.L.R. 1280, it is said:

"Businesses said to be clothed with a public interest justifying some public regulation may be divided into three classes:

"(1) Those which are carried on under the authority of a public grant of privileges which either expressly or impliedly imposes the affirmative duty of rendering a public service demanded by any member of the public. Such are the railroads, other common carriers and public utilities.

"(2) Certain occupations, regarded as exceptional, the public interest attaching to which, recognized from earliest times, has survived the period of arbitrary laws by Parliament or colonial Legislatures for regulating all trades and callings. Such are those of the keepers of inns, cabs, and grist mills. [Citations].

"(3) Businesses which, though not public at their inception, may be fairly said to have risen to be such and have become subject in consequence to some government regulation. They have come to hold such a peculiar relation to the public that this is superimposed upon them. In the language of the cases, *the owner by devoting his business to the public use, in effect grants the public an interest in that use and subjects himself to public regulation to the extent of that interest although the property continues to belong to its private owner* and to be entitled to protection accordingly." (Emphasis supplied).

That the business of insurance falls within the limits of class 3 is evident.

In German Alliance Insurance Company v. Lewis, 233 U.S. 389, 34 S.Ct. 612, 58 L. Ed. 1011, L.R.A.1915C, 1189, it is said:

"The effect of insurance—indeed, it has been said to be its fundamental object— is to distribute the loss over as wide an area as possible. In other words, the loss is spread over the country, the disaster to an individual is shared by many, the dis-

aster to a community shared by other communities; great catastrophies are thereby lessened, and, it may be, repaired. In assimilation of insurance to a tax, the companies have been said to be the mere machinery by which the inevitable losses by fire are distributed so as to fall as lightly as possible on the public at large, the body of the insured, not the companies, paying the tax. Their efficiency, therefore, and solvency, are of great concern. The other objects, direct and indirect, of insurance, we need ·not mention. Indeed, it may be enough to say, without stating other effects of insurance, that a large part of the country's wealth, subject to uncertainty of loss through fire, is protected by insurance. This demonstrates the interest of the public in it, and we need not dispute with the economists that this is the result of the 'substitution of certain for uncertain loss,' or the diffusion of positive loss over a large ·group of persons, as we have already said to be certainly one of its effects. We can see, therefore, how it has come to be considered a matter of public concern to regulate it, and, governmental insurance has its advocates and even examples. Contracts of insurance, therefore, have greater public consequence than contracts between individuals to do or not to do a particular thing whose effect stops with the individuals. We may say in passing that when the effect goes beyond that, there are many examples of regulation." 233 U.S. at pages 412, 413, 34 S.Ct. at page 619, 58 L.Ed. 1011, L.R.A.1915C, 1189.

The underlying thought here appears to be that public necessity and not private advantage or gain justifies regulation within the Constitution.

Acting on this theory it has been held that the State may:

1: Require that insurance rates shall be reasonable. German Alliance Insurance Co. v. Lewis, 233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011, L.R.A.1915C, 1189.

In speaking of the statute involved in that case the Court said: "The statute seeks to secure rates which shall be reasonable both to the insurer and the insured, and as a means to this end it prescribes equality of charges, forbids initial discrimination or subsequently by the refund of a portion of the rates, or the extension to the insured of any privilege; to this end it requires publicity in the basic schedules and of all of the conditions which affect the rates or the value of the insurance to the insured,

and also adherence to the rates as published. Whether the requirements are necessary to the purpose, or—to confine ourselves to that which is under review— whether rate regulation is necessary to the purpose, is a matter for legislative judgment, not judicial. Our function is only to determine the existence of power." 233 U. S. at page 417, 34 S.Ct. at page 621, 58 L.Ed. 1011, L.R.A.1915C, 1189.

The vital provision of the statute referred to (Laws Kan.1909, c. 152) relating to rates of insurance is as follows: "Sec. 3. When the superintendent shall determine any rate is excessive or unreasonably high, or not adequate to the safety or soundness of the company, he is authorized to direct the company to publish and file a higher or lower rate, which shall be commensurate with the character of the risk; *but in every case the rate shall be reasonable.*" 233 U.S. at page 391, 34 S.Ct. at page 613, 58 L.Ed. 1011, L.R.A.1915C, 1189. (Emphasis supplied).

The principle upon which fixing of rates charged for insurance is based is aptly stated by the Court as follows: "We may venture to observe that the price of insurance is not fixed over the counters of the companies by what Adam Smith calls the higgling of the market, but formed in the councils, of the underwriters, promulgated in schedules of practically controlling constancy which the applicant for insurance is powerless to oppose, and which, therefore, has led to the assertion that the business of insurance is of monopolistic character and that 'it is illusory to speak of a liberty of contract.' It is in the alternative presented of accepting the rates of the companies or refraining from insurance, business necessity impelling if not compelling it, that we may discover the inducement of the Kansas statute; and the problem presented is whether the legislature could regard it of as much moment to the public that they who seek insurance should no more be constrained by arbitrary terms than they who seek transportation by railroads, steam or street, or by coaches whose itinerary may be only a few city blocks, or who seek the use of grain elevators, or be secured in a night's accommodation at a wayside inn, or in the weight of a 5 cent loaf of bread. We do not say this to belittle such rights or to exaggerate the effect of insurance, but .to exhibit the principle which exists in all and brings all under the same governmental power."

233 U.S. at pages 416, 417, 34 S.Ct. at page 621, 58 L.Ed. 1011, L.R.A.1915C, 1189.

Again public need is the underlying thought. O'Gorman & Young v. Hartford Insurance Co., 282 U.S. 251, 257, 51 S.Ct. 130, 75 L.Ed. 324, 72 A.L.R. 1163.

The statute involved in this case (P.L. N.J.1928, p. 257, § 1), provided: "In order that rates of insurance against the hazards of fire shall be reasonable it shall be unlawful for any such insurer licensed in this State to * * * allow * * * any commission * * * *in excess of a reasonable amount,* to any person for acting as its agent in respect to any class of such insurance, nor * * * to allow, any commission * * * to any person for acting as its local agent in respect to any class of such insurance, in excess of that * * * allowed to any one of its local agents on such risks in this State." 282 U.S. at page 255, 51 S.Ct. at page 131, 75 L.Ed. 324, 72 A.L.R. 1163. (Emphasis supplied).

In affirming a decision of the Supreme Court of the State of New Jersey upholding the validity of this statute Mr. Justice Brandeis observed: "The agent's compensation, being a percentage of the premium, bears a direct relation to the rate charged the insured. The percentage commonly allowed is so large that it is a vital element in the rate structure and may seriously affect the adequacy of the rate. *Excessive commissions may result in an unreasonably high rate level or in impairment of the financial stability of the insurer.*" 282 U.S. at page 257, 51 S.Ct. at page 131, 75 L.Ed. 324, 72 A.L.R. 1163. (Emphasis supplied).

Here again the public interest,—a fair price to the insured and reasonable probability of being reimbursed in case of loss, is the principle controlling the decision.

■ 2: Prescribe the qualifications of insurance brokers. La Tourette v. McMaster, 248 U.S. 465, 39 S.Ct. 160, 63 L.Ed. 362.

In this case the Court stated: "An act * * * entitled 'An act to provide for the licensing of insurance brokers,' defines in its first section an insurance broker 'to be such person as shall be licensed by the insurance commissioner to represent citizens' of the state [for the placing of insurance in insurers] in 'the 'state or in any other state or country.' And it is provided in section 2 of the act, among other conditions, that only such persons may be licensed as are residents of the state and have been licensed insurance agents of the state for at least two years." 248 U.S. at page 466, 39 S.Ct. at page 161, 63 L.Ed. 362.

The complainant, a resident and citizen of the State of New York, there contended:

1: That he was thereby deprived of his liberty and property by the act of the State of "South Carolina" in violation of the due process clause of the Fourteenth Amendment; and,

2: That the act discriminates against citizens of other states and in favor of citizens of the State of South Carolina in violation of Section 2, Article IV of the Constitution of the United States.

In overruling these contentions the Court said: "This contention depends upon the character of the business of insurance, and it was decided in German Alliance Insurance Co. v. Lewis, 233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011, L.R.A.1915C, 1189, to be clothed with a public interest and subject, therefore, to the regulating power of the state. And it necessarily follows that, as insurance is affected with a public interest, those engaged in it or who bring about its consummation are affected with the same interest and subject to regulation as it is. A broker is so engaged—is an instrument of such consummation. The statute makes him the representative of the insured. He is also the representative of the insurer (Hooper v. California, 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297), and his fidelity to both may be the concern of the state to secure. As said by the Supreme Court of the state (104 S.C. 501, 89 S.E. 398): 'It is important for the protection of the interests of the people of the state that the business should be in the hands of competent and trustworthy persons.' And we may say that this result can be more confidently and completely secured through resident brokers, they being immediately under the inspection of the commissioner of insurance. *The motive of the statute, therefore, is benefit to insurer and insured and the means it provides seem to be appropriate.*" 248 U.S. at pages 467-468, 39 S.Ct. at page 161, 63 L.Ed. 362. (Emphasis supplied).

The necessary result of this ruling is that to justify regulation of insurance companies by statute two elements must concur,—1. Public need for such regulation;

and,—2. The regulatory statute,—the means provided to supply this need must be appropriate to that end.

 3: To limit agents' commissions. O'Gorman & Young v. Hartford Fire Insurance Co., 282 U.S. 251, 51 S.Ct. 130, 75 L.Ed. 324, 72 A.L.R. 1163.

The theory justifying this rule is stated by the Court as follows: "The agent's compensation, being a percentage of the premium, bears a direct relation to the rate charged the insured. The percentage commonly allowed is so large that it is a vital element in the rate structure and may seriously affect the adequacy of the rate. Excessive commissions may result in an unreasonably high rate level or in impairment of the financial stability of the insurer. It was stated at the bar that the commission on some classes of insurance is as high as thirty-five per cent. Moreover, lack of a uniform scale of commissions allowed local agents for the same service may encourage unfair discrimination among policyholders by facilitating the forbidden practice of rebating. In the field of life insurance, such evils led long ago to legislative limitation of agents' commissions." 282 U.S. at page 257, 51 S.Ct. at page 131, 75 L.Ed. 324, 72 A.L.R. 1163.

The clear purpose of this rule is to limit the amount paid to the agent as commission to the fair value of the service rendered by him.

4: To prohibit combinations of insurance companies as to rates, commissions and manner of doing business. Carroll v. Greenwich Insurance Company, 199 U.S. 401, 26 S.Ct. 66, 50 L.Ed. 246.

The portion of the statute (Code Iowa 1897, § 1754) material to the decision in that case is as follows: "It shall be unlawful for two or more fire insurance companies doing business in this state, * * * to make or enter into any combination or agreement relating to the rates to be charged for insurance, the amount of commissions to be allowed agents for procuring the same, or the manner of transacting the fire insurance business within this state; and any such company, * * * violating this provision shall be guilty of a misdemeanor", and a fine is imposed for each offense.

The statute also makes it the duty of the Auditor of State to summon for examination, under oath, any officer, agent or employee suspected of violating this law, and

if he determines that the company is guilty, or if the officer or agent fails to appear, to revoke the authority of the company to do business in the state for one year. 199 U.S. at pages 407 and 408, 26 S.Ct. at page 66, 50 L.Ed. 246.

The Circuit Court held that the prohibition of agreements as to the amount of commission to be allowed, or as to the manner of transacting the fire insurance business in the state, were contrary to the Fourteenth Amendment. 199 U.S. at page 408, 26 S.Ct. 66, 50 L.Ed. 246.

During the course of the opinion, written by the Late Mr. Justice Holmes, it is said: "The object of the law, we assume, until the Iowa court shall decide otherwise, is single,—*to keep up competition*,—and the general language is to be restricted by the specific provisions and to *the particular end*. Limited as we understand it to be limited, the statute goes no further than others which have been sustained, and does not contravene the Constitution of the United States." 199 U.S. at page 412, 26 S.Ct. at page 68, 50 L.Ed. 246. (Emphasis supplied).

It is obvious that the interests of the citizens of the State may be injuriously affected by a combination of two or more fire insurance companies to do either of the forbidden things. At this date one would be daring indeed to contend that combinations in restraint of trade may not be forbidden by law.

5: To provide that insurance against loss by hail in North Dakota shall take effect from and after twenty-four hours from the day and hour the application for such insurance has been taken. National Union Fire Insurance Company v. Wanberg, 260 U.S. 71, 43 S.Ct. 32, 67 L.Ed. 136.

The material part of the statute (Comp. Laws N.D.1913, § 4902) follows: "Every insurance company engaged in the business of insuring against loss by hail in this state, shall be bound, and the insurance shall take effect from and after twenty-four hours from the day and hour the application for such insurance has been taken by the authorized local agent of said company, and if the company shall decline to write the insurance upon receipt of the application, it shall forthwith notify the applicant and agent who took the application, by telegram, and in that event, the insurance shall not become effective * * *." 260 U.S.,

at page 72, 43 S.Ct. at page 32, 67 L.Ed. 136.

The Court held the enactment to be a valid exercise of legislative power and said: "We agree that this legislation approaches closely the limit of legislative power, but not that it transcends it. The statute treats the business of hail insurance as affected with a public interest. In that country, where a farmer's whole crop, the work and product of a year, may be wiped out in a few minutes and where the recurrence of such manifestations of nature is not infrequent, and no care can provide against their destructive character, it is of much public moment that agencies like insurance companies to distribute the loss over the entire community should be regulated so as to be effective for the purpose. The danger and loss to be mitigated are possible for a short period. The storms are usually fitful, and may cover a comparatively small territory at a time, so that of two neighbors, one may have a total loss, and the other may escape altogether. The risk justifies a high rate of insurance. They differ so much in these and other respects from other insurance that it may properly call for special legislative treatment." 260 U.S. at page 74, 43 S.Ct. at page 33, 67 L.Ed. 136.

The crux of the holding is that public need growing out of local climatic conditions justified the legislation.

6: To require that any policy issued by an insurance company, to indemnify the owner of a motor vehicle against liability to persons injured through negligence in its operation, shall provide that the insolvency or bankruptcy of the insured shall not release the company from payment of damages for an injury sustained during the life of the policy, and that, in case execution against the insured in an action brought by a person so injured shall be returned unsatisfied because of such insolvency or bankruptcy, the injured person may maintain an action against the company on the policy for the amount of the judgment not exceeding the amount of the policy. It was held that the regulation is reasonable, and within the police power; and cannot be said to deprive the Insurance Company of property without due process of law. Merchants Mut. Automobile Liability Ins. Company v. Smart, 267 U.S. 126, 45 S.Ct. 320, 69 L.Ed. 538.

In reaching this conclusion the Court used this language: "Such regulation would seem to be peculiarly applicable to that form of insurance which has come into very wide use of late years, that of indemnifying the owners of vehicles against losses due to the negligence of themselves or their servants in their operation and use. The agencies for the *promotion of comfort and speed in the streets are so many and present such possibility of accident and injury to members of the public that the owners have recourse to insurance to relieve them from the risk of heavy recoveries they run in intrusting these more or less dangerous instruments to the care of their agents.* Having in mind the sense of immunity of the owner protected by the insurance *and the possible danger of a less degree of care due to that immunity, it would seem to be a reasonable provision by the state in the interest of the public,* whose lives and limbs are exposed, to require that the owner in the contract indemnifying him against any recovery from him should stipulate with the insurance company that the indemnity by which he saves himself should certainly inure to the benefit of the person who thereafter is injured. Section 109 does not go quite so far. It provides that the subrogation shall take place only when the insured proves insolvent or bankrupt, and leaves the injured person to pursue his judgment against the insured if solvent without reliance on the policy." 267 U.S. at pages 129, 130, 45 S.Ct. at page 321, 69 L.Ed. 538. (Emphasis supplied).

The thought justifying this legislation is that the State has a legal right to protect its citizenry against uncompensated injury and loss.

7: To provide that in all cases where loss occurs and the insurance company liable therefor shall fail to pay the same within the time specified in the policy, such company shall be liable to pay the holder of such policy, in addition to the amount of such loss, twelve per cent damages upon the amount of such loss, together with all reasonable attorney's fees for the prosecution and protection of said loss; said attorney's fees to be fixed by the Court. Life & Casualty Company v. McCray, 291 U.S. 566, 54 S.Ct. 482, 78 L. Ed. 987.

The need for such legislation and its justification in the public interest is stated by Mr. Justice Cardozo, speaking for the Court, in these words: "Dependents left without a breadwinner will be exposed to

sore distress if life insurance payments are extracted slowly and painfully, after costly contests in the courts. Health and accident insurance will often be the sources from which the sick and the disabled are to meet their weekly bills. Fire insurance moneys, if withheld, may leave the business man or the householder without an office or a home. Classification prompted by these needs is not tyrannical or arbitrary. As to that, the judgments of this court in situations precisely apposite have set a closure to debate." 291 U.S. at pages 569, 570, 54 S.Ct. at page 484, 78 L.Ed. 987.

8: To levy a tax on insurance written within its boundaries. Palmetto Fire Insurance Company v. Conn, 272 U.S. 295, 47 S.Ct. 88, 71 L.Ed. 243.

There, by the terms of a "blanket" contract, entered into in Michigan between a South Carolina Insurance Company and a Michigan Sales Company, engaged in marketing all of the automobiles of a particular make, the insurance company insured future purchases of the cars against fire and theft; the insurance was to become automatically effective whenever anyone bought a car and took delivery or a bill of sale, without regard to the wish of the purchaser; the sales company was to make monthly reports to the insurance company of all cars for which insurance was thus provided and pay premiums accordingly, in Michigan; and the insurance company was to send certificates of insurance to the respective purchasers. The court held that where such insurance became effective through sales of cars in other states, though sold by distributors and retail dealers who owned them and were not the agents of the sales company, laws of those other states regulating and taxing insurance were constitutionally applicable to such local transactions, and the fact that the cost of the insurance was taken up in the price of the cars so sold would not prevent the insurance from being reached.

The pith of the decision is stated by the court in these words: "Manifestly there was nothing in the contract between the plaintiff and the Chrysler Sales Corporation, without more, that Ohio could lay hold of, even if it insured property in Ohio. But the contract contemplated and provided for a benefit to third persons, if, when, and where they complied with its conditions. When a man bought a car in Ohio, by that act he made effective the agreement of the Company to insure future purchasers, and imposed upon it an obligation that did not exist before. It is true that the obligation arose from a contract made under the law of another State, but the act was done in Ohio and the capacity to do it came from the law of Ohio, so that the cooperation of that law was necessary to the obligation imposed. It would be held in some jurisdictions that the purchaser became party to a contract with the insurance company. By universal consent he at least would become the beneficiary of a contract for his benefit. Whatever technical form may be given to the reasoning, the substance is that by acts done in Ohio the purchaser obtains for himself the advantage of insurance that before that moment did not exist. It does not matter whether his getting it was a large or an inconspicuous feature of his bargain. It was part of it in any event, and we cannot doubt that the lower Court was right in holding that in such circumstances the State could insist upon its right to tax." 272 U.S. at pages 304–305, 47 S.Ct. at page 89, 71 L.Ed. 243.

9: To tax a foreign corporation for the privilege of doing business within its boundaries so long, and only so long, as it does not violate rights secured by the Federal Constitution. Baltic Mining Co. v. Mass., 231 U.S. 68–88, 34 S.Ct. 15, 58 L.Ed. 127.

These cases fairly disclose the general conditions under which, and the legal theory on which, the right of the State to regulate the business of insurance done within its boundaries rests; and that the power, or want of power, in the State depends upon the particular circumstances of the situation.

It has been held that the State may not:

1: Regulate the business of a foreign corporation, licensed to do business within the State, done outside its borders, and which would otherwise be beyond the State's authority. New York Life Insurance Co. v. Head, 234 U.S. 149, 163, 34 S.Ct. 879, 58 L.Ed. 1259.

The thought upon which this holding is based is expressed by the Court in these words: "The Constitution and its limitations are the safeguards of all the states, preventing any and all of them, under the guise of license or otherwise, from exercising powers not possessed." 234 U.S. at page 164, 34 S.Ct. at page 883, 58 L.Ed. 1259.

See also: Fidelity & Deposit Co. v. Tafoya, 270 U.S. 426, 46 S.Ct. 331, 70 L.Ed. 664.

■ 2: Prevent a foreign insurance company doing business within its limits from employing and paying those whom it needs for its business outside the state. Fidelity & Deposit Co. v. Tafoya, 270 U.S. 426, 435, 46 S.Ct. 331, 70 L.Ed. 664.

The statute (Code N.M.1915, § 2820, as amended by Laws 1921, c. 195) involved purports to make it "unlawful for any insurance company authorized to do business in New Mexico * * * to pay, * * * either directly or indirectly, any fee, brokerage or other emolument of any nature to any person, firm or corporation not a resident of the State of New Mexico, for the obtaining, placing or writing of any policy or policies of insurance covering risks in New Mexico. Any insurance company violating this section shall have its certificates of authority to do business in this State suspended for not less than one year"—the suspension to be removed only upon a written pledge that the section would be observed. 270 U.S. at page 433, 46 S. Ct. at page 331, 70 L.Ed. 664.

As stated by the Court, the point on which the decision in that Case turned is: "The words [of this statute, interpolated] go beyond any legitimate interest of the State." 270 U.S. at page 435, 46 S.Ct. at page 332, 70 L.Ed. 664.

■ 3. Extend the effect of its laws beyond its borders so as to destroy or impair the rights of citizens of other states to make a contract not operative within its jurisdiction and lawful where it is made. Hartford Accident & Indemnity Co. v. Delta & Pine Land Co., 292 U.S. 143, 149, 54 S.Ct. 634, 78 L.Ed. 1178, 92 A.L.R. 928; New York Life Ins. Co. v. Head, 234 U.S. 149, 162, 164, 34 S.Ct. 879, 58 L.Ed. 1259; New York Life Ins. Co. v. Dodge, 246 U.S. 357, 373, 374, 38 S.Ct. 337, 62 L.Ed. 772, Ann.Cas.1918E, 593; Ætna Life Ins. Co. v. Dunken, 266 U.S. 389, 399–400, 45 S.Ct. 129, 69 L.Ed. 342.

■ 4: Use its power to exclude a foreign corporation from doing business within its borders as a means of accomplishing that which is forbidden to the State, such as the regulation of conduct in another jurisdiction. Fidelity & Deposit Co. v. Tafoya, 270 U.S. 426, 434, 435, 46 S.Ct. 331, 70 L.Ed. 664; Frost & Frost Trucking Co. v. Railroad Commission, 271 U.S. 583, 594, 595, 46 S.Ct. 605, 70 L.Ed. 1101, 47 A.L.R. 457; Northwestern National Insurance Co. v. Lee, D.C., 49 F.2d 274, 280.

■ 5: Go beyond any legitimate interest of the State under the guise of regulation. Fidelity & Deposit Co. v. Tafoya, 270 U.S. 426, 435, 46 S.Ct. 331, 70 L.Ed. 664.

■ 6: Exclude a foreign corporation from doing business within the State solely because it exercises a right secured by the Federal Constitution. Frost & Frost Trucking Co. v. Railroad Commission, 271 U.S. 583, 599, 46 S.Ct. 605, 70 L.Ed. 1101, 47 A.L.R. 457.

The theory upon which this rule rests is stated by the Court in these words: "This court has repeatedly said that such right of exclusion is qualified by the superior right of all citizens to enjoy the protection of the federal Constitution." 271 U.S. at page 597, 46 S.Ct. at page 608, 70 L.Ed. 1101, 47 A.L.R. 457.

■ 7: To estop a foreign corporation which has sought and obtained permission to do business in the State from objecting to the enforcement of its enactments that conflict with the Constitution of the United States. Northwestern National Insurance Co., v. Lee, D.C., 49 F.2d 274, 279, 280.

There the Court stated the reason controlling the decision as follows: "It is established that a corporation, by seeking and obtaining permission to do business in a state, does not thereby become bound to comply with, or estopped from objecting to, the enforcement of its enactments that conflict with the Constitution of the United States. The right to withhold from a foreign corporation permission to do local business therein does not enable the state to require such a corporation to surrender the protection of the federal Constitution." 49 F.2d at page 280.

■ 8: To use the power and constitutional right, assuming that it has it, to exclude a foreign corporation from doing business within its borders, without other reason than such is its will, as a part of a scheme to accomplish a forbidden act. Fidelity & Deposit Co. v. Tafoya, 270 U.S. 426, 46 S.Ct. 331, 70 L.Ed. 664; Chicago, B. & Q. Railroad Co. v. McGuire, 219 U.S. 549, 569, 31 S.Ct. 259, 55 L.Ed. 328.

■ 9: To regulate business done within its borders by legislative action which is arbitrary or has no reasonable re-

lation to an object within the State authority. Chicago, B. & Q. Railroad Co. v. McGuire, 219 U.S. 549, 569, 31 S.Ct. 259, 55 L.Ed. 328.

In that case, after reviewing the decisions controlling the right, or want of right, in the State to control business done within its borders, the Court stated the principle upon which the decisions rest in these words: "The principle involved in these decisions is that where the legislative action is arbitrary and has no reasonable relation to a purpose which it is competent for government to effect, the legislature transcends the limits of its power in interfering with liberty of contract; but where there is reasonable relation to an object within the governmental authority, the exercise of the legislative discretion is not subject to judicial review. * * * If there existed a condition of affairs concerning which the legislature of the state, exercising its conceded right to enact laws for the protection of the health, safety, or welfare of the people, might pass the law, it must be sustained; if such action was arbitrary interference with the right to contract or carry on business, and having no just relation to the protection of the public within the scope of legislative power, the act must fail." 219 U.S. at pages 569, 570, 31 S.Ct. at page 263, 55 L.Ed. 328.

The decision in the instant case depends upon the question whether, when the facts as admitted and found by the Court are measured by these rules, the legislation involved here falls within the limits of the May or May Not rules.

■ Defendant argues that in deciding this question we must "start from the premise that 'the constitutionality of a legislative enactment is to be presumed until the contrary is shown beyond a reasonable doubt'"; and in support of this contention cites Henderson Bridge Co. v. Henderson, 173 U.S. 592, 614, 19 S.Ct. 553, 43 L.Ed. 823; Sweet v. Rechel, 159 U.S. 380, 16 S. Ct. 43, 40 L.Ed. 188; Atchison, Topeka & Santa Fe Railway Co. v. Matthews, 174 U.S. 96, 19 S.Ct. 609, 43 L.Ed. 909.

That such is the general rule is not open to question.

In Nebbia v. New York, 291 U.S. 502, 537, 538, 54 S.Ct. 505, 516, 78 L.Ed. 940, 89 A.L.R. 1469 it is said: "So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio*. 'Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.' Northern Securities Co. v. United States, 193 U.S. 197, 337, 338, 24 S.Ct. 436, 457, 48 L.Ed. 679. And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. *Times without number we have said that the Legislature is primarily the judge of the necessity of such an enactment* [an act fixing the price of milk, interpolated], *that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power."* (Emphasis supplied).

In West Coast Hotel Co. v. Parrish, 300 U.S. 379, 397, 398, 57 S.Ct. 578, 584, 81 L.Ed. 703, 108 A.L.R. 1330, in sustaining a state law fixing the wage of women workers, the Court used this language: "In Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469, dealing with the New York statute providing for minimum prices for milk, the general subject of the regulation of the use of private property and of the making of private contracts received an exhaustive examination, and we again declared that if such laws 'have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied'; that 'with the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal'; that.

'times without number we have said that the Legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power.' Id., 291 U.S. 502, at pages 537, 538, 54 S.Ct. 505, 516, 78 L.Ed. 940, 89 A.L.R. 1469."

██ However, in this connection it must be borne in mind that the facts peculiar to each case control the decision in that case.

In the case of Nebbia v. New York, 291 U.S. 502, 536, 54 S.Ct. 505, 515, 78 L.Ed. 940, 89 A.L.R. 1469, it is said: "It is clear that there is no closed class or category of businesses affected with a public interest, and the function of courts in the application of the Fifth and Fourteenth Amendments is to determine *in each case* whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory." (Emphasis supplied).

In Baltic Mining Company v. Massachusetts, 231 U.S. 68, 85, 34 S.Ct. 15, 18, 58 L.Ed. 127, a case which presented the question of the constitutional validity of an act of the Commonwealth of Massachusetts undertaking to impose a tax on a foreign corporation within the Commonwealth, the Court stated the rule as follows: "Every case involving the validity of a tax *must be decided upon its own facts,* and having no disposition to limit the authority of those cases [cases theretofore cited in the opinion, interpolated], the facts upon which they were decided must not be lost sight of in deciding other and alleged similar cases." (Emphasis supplied). See also: Allgeyer v. Louisiana, 165 U.S. 578, 590, 17 S.Ct. 427, 41 L.Ed. 832; Cuyahoga R. P. Co. v. City of Akron, 240 U.S. 462, 36 S.Ct. 402, 60 L.Ed. 743; Fidelity & Deposit Co. v. Tafoya, 270 U.S. 426, 434, 46 S.Ct. 331, 70 L.Ed. 664.

██ Here we are not dealing with an abstraction. The complainant in this case is facing a condition, not a theory. It is here seeking to protect itself against—1: The loss of the benefit of contracts lawful at the time and place they were made, and in the State of Montana at that time; 2: A complete destruction of its agency plants and business within that state; 3: A revocation of its license to do business in Montana; and, 4: To protect itself against fines and other penalties, all threatened because it has failed to pay to a local agent resident in Montana, whose only service consisted of countersigning the policy, all of the commission available for soliciting, procuring and writing the insurance referred to in the Bill of Complaint herein and has paid, or agreed to pay, to non-resident agents some part of that commission for services of value rendered by them in that connection outside of the State of Montana pursuant to contracts made outside of that State in violation of the provisions of Chapter 95 of the Laws of Montana 1937, as interpreted by the Attorney General of that State and threatened to be enforced against it by the defendant John J. Holmes as State Auditor and Ex Officio Commissioner of Insurance of the State of Montana, in violation, as complainant contends, of rights and liberties guaranteed to it by the Constitution of the United States of America.

If the threatened acts of the defendant John J. Holmes, acting as State Auditor and Ex Officio Commissioner of Insurance of the State of Montana, are based upon State legislation which as interpreted and intended to be enforced contravene any provision of the Constitution of the United States intended to secure the rights and liberties of the individual it is clear that the complainant here is entitled to the relief it asks. This is true whether the threatened act be within or without the power of the officer under the legislation involved in this proceeding as properly understood; for whether the complainant here has any right that the State of Montana and its agent John J. Holmes as State Auditor and Commissioner of Insurance are bound to respect, can be decided only by taking jurisdiction of the case and enjoining the threatened acts of the defendant here if it be determined, on the facts peculiar to this proceeding, that the acts intended to be done by him will deprive the complainant here of a right guaranteed to it by the Federal Constitution. Cuyahoga River Power Co. v. City of Akron, 240 U. S. 462, 463, 464, 36 S.Ct. 402, 60 L.Ed. 743; Home Telephone & Telegraph Co. v. Los Angeles, 227 U.S. 278, 286–293, 33 S. Ct. 312, 57 L.Ed. 510; Fidelity & Deposit Co. v. Tafoya, 270 U.S. 426, 434, 46 S. Ct. 331, 332, 70 L.Ed. 664.

In the case last cited it is said: "It is suggested that the District Court had no jurisdiction because the bill does not allege

that the statute is unconstitutional, *but only that the statute as construed and applied by the defendants is so*. But even if the statute did not plainly purport to justify and require the threatened action, or if the bill fairly taken did not import a denial of the constitutionality of the law *as applied to this case,* the plaintiff still would be entitled to come into a Court of the United States to prevent such an alleged violation of its constitutional rights." (Emphasis supplied.)

In this view we do not feel called upon to consider or determine, and do not consider or determine, whether Chapter 95 of the Laws of Montana, 1937, may be so construed as to bring it within the constitutional power of the Legislative Assembly of the State of Montana.

 It is established:

1: That so far as the requirement of due process within the meaning of the Constitution of the United States is concerned, and in the absence of other constitutional restrictions, a state is free to adopt whatever economic policy may reasonably be deemed to promote the public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, where it has been declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied and judicial determination to that effect renders a court functus officio; and, that with the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. Nebbia v. New York, 291 U.S. 502, 537, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; West Coast Hotel Co. v. Parrish, 300 U.S. 379, 398, 57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330.

 2: That a corporation is a "person" within the meaning of the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States. Northwestern National Insurance Co. of Milwaukee, Wis., v. Lee, D.C., 49 F.2d 274, 279; Terral v. Burke Construction Co., 257 U.S. 529, 531, 533, 42 S.Ct. 188, 66 L.Ed. 352, 21 A.L.R. 186; Kentucky Finance Corporation v. Paramount Auto Exchange Corporation, 262 U.S. 544, 550, 43 S.Ct. 636, 67 L.Ed. 1112;

Power Mfg. Co. v. Saunders, 274 U.S. 490, 493, 47 S.Ct. 678, 71 L.Ed. 1165.

 3: That a corporation, by seeking and obtaining permission to do business in this state, does not thereby become bound to comply with or estopped from objecting to the enforcement of its enactments that conflict with the Constitution of the United States. The right to withhold from a foreign corporation permission to do local business therein does not enable the state to require such a corporation to surrender the protection of the Federal Constitution. Northwestern National Insurance Co. of Milwaukee, Wis., v. Lee, D.C., 49 F.2d 274, 280, and, cases cited; Terral, as Secretary of State of the State of Arkansas v. Burke Construction Co., 257 U.S. 529, 533, 42 S.Ct. 188, 66 L.Ed. 352, 21 A.L.R. 186.

 4: That a foreign corporation doing business within a state is no more bound by a general unconstitutional enactment than a citizen of the state. Carroll v. Greenwich Ins. Co., 199 U.S. 401, 409, 26 S.Ct. 66, 50 L.Ed. 246; Hanover Fire Ins. Co. v. Harding, 272 U.S. 494, 507, 47 S.Ct. 179, 71 L.Ed. 372, 49 A.L.R. 713; Connecticut Gen. Life Ins. Co. v. Johnson, Treasurer of Calif., 303 U.S. 77, 79, 80, 58 S.Ct. 436, 438, 82 L.Ed. 673.

In the last cited case the Court stated the rule in these words: "A corporation which is allowed to come into a state and there carry on its business may claim, as an individual may claim, the protection of the Fourteenth Amendment against a subsequent application to it of state law." See also: Northwestern Nat. Ins. Co. of Milwaukee, Wis., v. Lee, D.C., 49 F.2d 274, 279; Louis K. Liggett Co. v. Baldridge, Atty. Gen. of Pa., et al., 278 U.S. 105, 111, 49 S.Ct. 57, 73 L.Ed. 204; Frost & Frost Trucking Co. v. Railroad Comm. of Cal., 271 U.S. 583, 593, 46 S.Ct. 605, 607, 70 L.Ed. 1101, 47 A.L.R. 457.

In the last cited case the Court used these words: "It would be a palpable incongruity to strike down an act of state legislation which, by words of expressed divestment, seeks to strip the citizen of rights guaranteed by the federal Constitution, but to uphold an act by which the same result is accomplished under the guise of a surrender of a right in exchange for a valuable privilege which the state threatens otherwise to withhold. It is not necessary to challenge the proposition that, as a general rule, the state, having power to deny a privilege altogether, may grant

it upon such conditions as it sees fit to impose. But the power of the state in that respect is not unlimited, and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence."

5: That complainant's business is a property right and as such entitled to protection against state legislation in contravention of the federal constitution. Duplex Printing Press Co. v. Deering, 254 U.S. 443, 465, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; Traux v. Corrigan, 257 U.S. 312, 327, 42 S.Ct. 124, 66 L.Ed. 254, 27 A.L.R. 375; Louis K. Liggett Co. v. Baldridge, Atty. Gen. of Pa., et al., 278 U.S. 105, 111, 49 S.Ct. 57, 73 L.Ed. 204; Northwestern Nat. Ins. Co. of Milwaukee, Wis., v. Lee, D.C., 49 F.2d 274, 279, 280.

Projecting the facts peculiar to the instant proceeding against this background we proceed to consider and determine whether complainant's contentions are or are not well grounded.

Plaintiff's contentions are all grounded upon three facts:

1: That the statute involved in this proceeding requires that the countersigning agent resident in Montana shall receive "the full commission" on all policies, bonds or contracts of insurance "when the premium is paid". Chapter 95, Laws of Montana 1937, page 267, § 1;

2: That the words "full commission", as interpreted by the Attorney General of the State of Montana and threatened to be enforced by the defendant here, means that the countersigning agent resident in Montana shall receive all of the commission paid for all services rendered by all persons in any way connected with securing and issuing the policy of insurance; or as otherwise stated "that the resident Montana agent shall receive the same commission for countersigning an insurance contract as he would receive from the same business if he secured it himself". This is the construction given the law by the defendant Insurance Commissioner, and the threat to cancel the certificate of authority of the complainant here to do business in Montana arises out of the payment of the part of the commission paid on the insurance

involved in this proceeding to non-resident agents who solicited, procured and serviced the business outside of the State of Montana; and,

3: That the statute makes it unlawful "for any such resident agent to rebate or divide such commission, with intent to evade the provisions of this act". Chapter 95, § 1, Laws of Montana 1937, page 267.

Which means, as the statute is interpreted by the Attorney General of the State of Montana and acted upon by the defendant Insurance Commissioner, "that Chapter 95, Laws of 1937, prohibits a resident Montana agent from rebating or sharing the commission paid on any issued contract of insurance with an out-of-state agent forwarding the contract of insurance into the State of Montana for signature." (Par. 5, Order to Show Cause.)

Freedom of Contract:

In this situation complainant contends that "by this statute the State of Montana not only seeks to regulate and prohibit private contracts within the state but also to regulate and prohibit private contracts outside of the state. The latter it cannot do irrespective of its police power and in the former it has gone far beyond any reasonable exercise of that power."

Defendant concedes, as he must, "that freedom of contract is a basic and fundamental right reserved to the people by the Constitution of the United States and a right that a state cannot violate even under the sanction of direct legislative acts."

In West Coast Hotel Co. v. Parrish, 300 U.S. 379, 391, 392, 57 S.Ct. 578, 581, 81 L.Ed. 703, 108 A.L.R. 1330, it is said:

"The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation, the Constitution does not recognize an absolute and uncontrollable liberty. Liberty in each of its phases has its history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals, and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process.

"This essential limitation of liberty in general governs freedom of contract in particular. More than twenty-five years ago we set forth the applicable principle in these words, after referring to the cases where the liberty guaranteed by the Fourteenth Amendment had been broadly described.

" 'But it was recognized in the cases cited, as in many others, that freedom of contract is a qualified, and not an absolute, right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide necessary restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.' Chicago, B. & Q. R. Co., v. McGuire, 219 U.S. 549, 565, [567], 31 S.Ct. 259, 262, 55 L.Ed. 328."

It is said by a Three Judge Court in granting an injunction prohibiting the enforcement of legislation enacted by the legislative assembly of the State of Florida intended to regulate the citrus fruit industry in that state, immediately after quoting the language just quoted by us from the West Coast Hotel Company v. Parrish case: "The definition of due process here given contains two positive requirements. First: the regulation must be as applied to the citrus business, reasonable. To be reasonable it must not be arbitrary, nor should it be unjust to any of those whom it undertakes to regulate. Second: it must have been adopted in the interests of the community. In other words, the community or the public must have an interest in or be concerned with such regulation." Lakeland Highlands Canning Co., Inc., et al. v. Mayo et al., D.C., 28 F.Supp. 44, 46.

We agree with this statement; and it is supported by the authorities generally: Hardware Dealers' Mutual Fire Insurance Co. v. Glidden Co., 284 U.S. 151, 157, 158, 52 S.Ct. 69, 76 L.Ed. 214; New York Life Ins. Co. v. Dodge, 246 U.S. 357, 373, 38 S.Ct. 337, 62 L.Ed. 772, Ann.Cas.1918E, 593; Allgeyer v. Louisiana, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832; Fidelity & Deposit Co. v. Tafoya, 270 U.S. 426, 434, 436, 46 S.Ct. 331, 70 L.Ed. 664.

In his Reply Brief filed herein defendant says: "Complainant's brief is devoid of any authority showing the provisions of the legislative act here in question to be in anywise unreasonable, arbitrary and not likely to accomplish the purpose intended, namely: To protect the lives, liberties and properties of its citizens, and to promote their health, morals, education and good order. Barbier v. Connolly, 113 U.S. 27, 5 S.Ct. 357, 28 L.Ed. 923.

"In the first place, both briefs (complainant's brief and defendant's original brief, interpolated) quote Section 6164, R.C.M.1935, which was originally enacted in 1899 and applied to fire insurance companies only. The present act (Chapter 95, Laws of 1937, Montana) made the provisions of what was originally 6164, R.C.M. 1935, applicable to all insurance contracts. The only material change made was to insert the word 'full' between the words 'the' and 'commission,' so that the amendment now reads that the resident agent 'shall receive the full commission on all such policies,' instead of the former language 'receive the commission.'

"This brings us the question raised by Judge Baldwin at the hearing as to whether 'full' commission does not mean the 'entire' commission. In considering the answer to this question it must be borne in mind that for many years the insurance companies have paid their agents by what in the Tafoya case (270 U.S. 426 [46 S.Ct. 331, 332, 70 L.Ed. 664], interpolated) was called 'at well known conventional rates'. For example: A typical insurance company organization will have at their Home Office, let us assume in Hartford, Connecticut, General Agents. This agent receives a small commission called an 'overriding' commission on *all* policies written by that company of one-half of 1% of the premiums paid. Under him is an Eastern agency with headquarters at New York, and a Western agency with headquarters at San Francisco. In the case of a Montana policy it would be written through the San Francisco office, which would receive in turn a commission say of 1%. Under the San Francisco office is a Seattle office, being the Northwest regional office. This office may receive a 2% overriding (some times written 'overwriting') commission. Under the Seattle office is a Montana office in Helena, having jurisdiction of the agents of this state. That office will receive a 2½% commission. In the field at Butte, for example, is an insurance agency, which may in turn have sub-agents, and the Butte

agent divides between its chief and its sub-agent the 'conventional commission', depending upon the type of the policy written. The 'conventional insurance commission' on premiums vary from 2% on certain classes of policy (principally annuities) up to as high as 50% of the first year's premiums. Certain types of policies also carry commissions in lesser amounts on renewals. But generally, when an insurance agent speaks of commissions it means his percentage of the first year's premium, which is paid him by way of compensation for his services."

It is fair to assume, as we do for the purposes of this decision, that this statement truly sets out the agencies through which foreign insurance companies doing business in Montana must act in making, writing and placing contracts of insurance upon insurable risks resident, situated or located in this state, which originate beyond its borders, and the commission to be paid by it to each of them for a service rendered by it.

So assuming, it is obvious that the statute involved in this proceeding, as interpreted by the Attorney General of the State of Montana and threatened to be enforced by the defendant against the complainant here:

1: Prevents the complainant here from employing and paying those whom it needs for its business outside of the State of Montana;

2: Extends the effect of the Act involved in this proceeding beyond the borders of the State of Montana so as to destroy or impair the rights of citizens of other states, including the complainant here, to make contracts not operative within the jurisdiction of the State of Montana and lawful where they are made;

3: Uses the power of the State of Montana to exclude a foreign corporation from doing business within its borders as a means of regulating the conduct of the complainant in other jurisdictions;

4: Absolutely fixes the commission the complainant must pay to its countersigning agent resident in Montana for a service rendered in that state entirely without regard to the value of the service rendered;

5: Requires that complainant pay its countersigning agent resident in Montana for necessary services of value not rendered by him; and,

6: Deprives the complainant here of the right to pay for necessary services of value rendered by its agents residing out of the State of Montana;

All without right or legal authority.

It is also clear that to allow the defendant to carry his threat to enforce the Act involved in this proceeding, as interpreted by the Attorney General of the State of Montana, into effect against the complainant here would be to permit the State of Montana to regulate business done within its borders by legislative action, which is arbitrary, goes beyond any legitimate interest of the state, and is unjust as intended to be applied to the complainant here, as well as to deprive the complainant of its property without due process of law and to deny to it the equal protection of the laws. This the state may not do. Sec. 1, Fourteenth Amendment to the Constitution of the United States; Fidelity & Deposit Co. v. Tafoya, 270 U.S. 426, 434, 46 S.Ct. 331, 70 L.Ed. 664; other cases cited above.

Conclusions of Law:

The necessary legal conclusions are:

1: That Chapter 95 of the Laws of Montana 1937, insofar as it requires that an agent of the complainant here locally licensed and resident within the State of Montana shall receive the "full commission", as those words are interpreted by the Attorney General of the State of Montana, on all policies of insurance made, written or placed, or caused to be made, written or placed, upon insurable risks resident, situated or located within the State of Montana, and insofar as it prohibits said complainant from paying a portion of the commission on such insurance to agents and brokers in other states of the United States, is void, invalid and unconstitutional and in conflict with the Fourteenth Amendment to the Constitution of the United States;

2: That Chapter 95 of the Laws of Montana 1937 insofar as it undertakes to empower and authorize the defendant to suspend complainant's certificate of authority to do business in the State of Montana because of its refusal to pay the "full commission", as those words are interpreted by the Attorney General of the State of Montana, to its agents resident in the State of Montana, or because of payment of a part of the commission to complainant's agents and brokers not residing in the State of Montana, is void, invalid and unconstitu-

tional and in violation of the Fourteenth Amendment to the Constitution of the United States;

3: That the defendant, John J. Holmes, as State Auditor and Ex Officio Commissioner of the State of Montana, and all of his representatives, servants, employees and their respective successors in office, and all persons acting under his authority, should be perpetually restrained and enjoined from suspending or attempting to suspend complainant's right to do business in the State of Montana and from canceling or setting aside its certificate of authority so to do or from taking any further steps to that end in the proceeding upon which this action is based, and that the said defendant should be perpetually enjoined and restrained from refusing to renew complainant's certificate of authority to do business in the State of Montana from time to time as provided by law, or from in any manner suspending, attempting to suspend or otherwise interfering with the business of the complainant so long as complainant shall comply with the requirements of the Laws of the State of Montana excepting only the provisions of Chapter 95 of the Laws of Montana 1937, as interpreted by the Attorney General of the State of Montana and threatened to be enforced by the defendant here.

Findings of fact, conclusions of law and decree in conformity with this opinion will be signed when presented by counsel.